Yasharay **MACK**, Plaintiff–Appellant,

v.

**OTIS ELEVATOR COMPANY and Local 1 International Union of Elevator Constructors, Defendants–Appellees.**

No. 02–7056.

United States Court of Appeals, Second Circuit.

Argued: Nov. 1, 2002.

Final Submission: Jan. 3, 2003.

Decided: April 11, 2003.

Saul D. Zabell, Somma, Zabell & Associates, LLP (Michael G. McAlvin, of counsel), Farmingdale, NY, for Plaintiff–Appellant.

Kenneth W. Gage, Day, Berry & Howard LLP (Jamal M. Dawkins, of counsel), Stamford, CT, for Defendant–Appellee Otis Elevator Company.

Richard H. Markowitz, Markowitz & Richman (Nancy A. Walker, of counsel), Philadelphia, PA, for Defendant–Appellee Local 1 International Union of Elevator Constructors.

Nicholas M. Inzeo, Philip B. Sklover, Vincent J. Blackwood, Julie L. Gantz, Equal Employment Opportunity Commission, Washington, D.C., submitted a brief for Amici Curiae Equal Employment Opportunity Commission.

Before: FEINBERG, CARDAMONE, and SACK, Circuit Judges.

SACK, Circuit Judge.

The plaintiff, Yasharay Mack, appeals from the judgment of the United States District Court for the Southern District of New York (Loretta A. Preska, *Judge*), which granted the defendants' motion for summary judgment and dismissed the complaint. We conclude that the district court correctly granted the defendants' motion with respect to Mack's claims under Title VII alleging failure to represent, unlawful constructive discharge, and retaliation, but erred in granting the motion with respect to Mack's hostile work environment claim. Accordingly, we affirm in part and vacate and remand in part.

## STANDARD OF REVIEW

We review a district court's grant of summary judgment *de novo*, construing the evidence in the light most favorable to the nonmoving party. *Tenenbaum v. Williams*, 193 F.3d 581, 593 (2d Cir.1999), *cert. denied*, 529 U.S. 1098, 120 S.Ct. 1832, 146 L.Ed.2d 776 (2000). A district court must grant a motion for summary judgment if "there is no genuine issue as to any material fact and . . . the moving party

is entitled to a judgment as a matter of law," Fed.R.Civ.P. 56(c), i.e., "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). A fact is "material" for these purposes if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The recitation of the factual background of this appeal upon which we are about to embark paints at least one employee of the defendant Otis Elevator Company ("Otis") in decidedly unflattering colors. We therefore emphasize at the outset that at this stage of the proceedings we are required to construe the evidence in the light most favorable to the plaintiff, and much of the evidence the plaintiff presents is her own testimony. As a result, the account that follows may or may not reflect the facts as they are, or as they may be found at trial. *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir.2001).

## BACKGROUND

The plaintiff Yasharay Mack, an African–American woman, worked as an elevator mechanic's helper for Otis from July 1999 through May 2000. Mack was assigned to work assisting six mechanics at the Metropolitan Life Building, an office building with sixty elevators located at 200 Park Avenue in New York City ("200 Park").

The collective bargaining agreement ("CBA") between Otis and Local 1 International Union of Elevator Constructors ("Local 1" or "the Union") governing the employment of Mack and her co-workers at 200 Park provides that one mechanic is designated "mechanic in charge" whenever there are five or more Otis employees on one job, as there were at 200 Park. CBA at 23. James Connolly was the mechanic in charge at the site. Under the terms of the CBA, the mechanic in charge has "the right to assign and schedule work, direct the work force, assure the quality and efficiency of the assignment, and to enforce the safety practices and procedures." *Id.* According to Connolly's deposition testimony, he assigned work to the other mechanics and helpers, including Mack, as he was supposed to under the CBA. Connolly's supervisor, Phil Gallina, maintained an office at 200 Park but was seldom there.

According to Mack's deposition testimony, on her first day on the job at 200 Park, Connolly said to her, "I was curious to know what you look like and I have to say you are quite an attractive young lady." Mack Dep. at 83. Connolly then introduced her to another mechanic saying, "Tell me she is not the most attractive helper you've ever had. She is sticking with me." *Id.* Connolly continued to comment on Mack's appearance, telling her repeatedly, for example, that she had a "fantastic ass," *id.* at 125–26, "luscious lips," *id.* at 128, and "beautiful eyes," *id.* at 132.

Connolly regularly changed out of his uniform in front of Mack at the end of his shift, stripping down to his underwear and adjusting himself before changing into his street clothes. He also boasted to Mack about his sexual exploits. On one occasion, in front of all the other mechanics, Connolly grabbed Mack by the waist, pulled her onto his lap, tried to kiss her and touched her buttocks. Connolly explicitly questioned Mack's place in the elevator business as a woman and an African American. He told her that "spics" and

"niggers" did not "belong in the business," *id.* at 103, and that he did not "know why women are on this job anyway," *id.* at 138. Connolly, in his deposition testimony, disputed most of Mack's allegations, although he admitted to changing into his street clothes in front of her.

Mack further testified at her deposition that in November 1999, she repeatedly complained to Gallina about Connolly's behavior, and asked Gallina to transfer her to a different department so that she would not have to work with Connolly. Mack told Gallina that she was "plagued with a lot of sexist issues with [Connolly]," *id.* at 86, and that Connolly was "always making rude and sexist comments" to her, *id.* at 205. Mack also stated that she complained to Craig Reiff, a Union shop steward, in April or May of 2000, and similarly requested that Reiff transfer her to a different location.

Mack further testified that she repeatedly complained of Connolly's conduct to the other mechanics on her team, who, she says, often witnessed and sometimes participated in her mistreatment. Indeed, during their depositions, co-worker Richard Morrison admitted telling Mack to "Come on, bitch," Morrison Dep. at 31, and co-worker Gerard Lombardo admitted telling Mack that she was "attractive" and "smelled good," Lombardo Dep. at 80–81. Lombardo further stated that he witnessed Connolly frequently commenting on Mack's appearance. Co-worker Stephen Hook witnessed the lap incident, although he said that Mack was laughing when it occurred.

At the time of these events, Otis had a comprehensive policy in place that prohibited racial discrimination and sexual harassment in both its *quid pro quo* and hostile work environment manifestations. The policy provided several avenues of complaint for employees who thought themselves aggrieved, including an "800" telephone number that an employee could use to report the sort of incidents alleged here. The policy also instructed aggrieved employees to inform their "supervisor, unless he/she is the alleged harasser." Otis Elevator Co. Policy on Harassment in the Workplace. Mack concedes that she was aware of the policy. She testified, however, that she did not take advantage of all the avenues provided because she did not want to be considered "a rat." Mack Dep. at 198. She also testified that she knew that Connolly "had a reputation to get away with things and I was too new in the field to start trouble." · *Id.*

According to Mack, as part of his responsibilities in assigning and overseeing daily tasks, Connolly also assigned overtime work; the defendants counter that this was merely a clerical responsibility. *Compare* Defendants' Rule 56 Statement of Facts ¶ 16, *with* Plaintiff's Rule 56.1 Counterstatement of Facts ¶ 16. Mack testified that "[t]owards the end when things got bad with Connolly he gave me very little [overtime]. That's what he did when he was angry with people." Mack Dep. at 109. On May 16, 2000, according to Mack, Connolly, dressed only in his underwear, threatened Mack: "If you don't like the way I'm talking to you, if you don't like the way I am, you can go complain to Phil Gallina, you can complain to [Local 1 President] John Green.... I don't give a shit. I get away with everything. I always have and I always will.... You're nobody.... If you don't like the way I treat you, you can get the fuck out." *Id.* at 303–04. Mack replied, "I'm not going to quit my job because you're an idiot." *Id.* at 304.

Shortly thereafter, Mack's father contacted a Union representative and complained about his daughter's treatment. A meeting was arranged for Union represen-

tative Tony Orriga, Otis representative Paul Barrett, Mack and her father. At the meeting, Mack described Connolly's conduct, and Orriga and Barrett promised an investigation and offered to transfer Mack to their Rockefeller Center location. Mack never returned to work.

On October 13, 2000, Mack brought suit against Otis in the United States District Court for the Southern District of New York under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., New York State Human Rights Law, N.Y. Exec. Law § 290 et seq., and New York City Human Rights Law, N.Y.C. Admin. Code § 8–101 et seq., alleging that Otis had subjected her to a hostile work environment, had constructively discharged her, and had unlawfully retaliated against her. Mack also brought suit against the Union alleging constructive discharge,[1] retaliation and failure to represent. The defendants made a motion in the district court for summary judgment, which was granted in its entirety. *Mack v. Otis Elevator Co.*, 2001 WL 1636886, (S.D.N.Y. Dec.18, 2001) 2001 U.S. Dist. LEXIS 20917 ("*Mack*").

Mack appeals.

## DISCUSSION

### I. Hostile Work Environment Claim

The district court concluded, *inter alia*, that Mack had not evinced evidence from which a reasonable trier of fact could conclude that Mack was harassed by an Otis "supervisor," and that Otis could not, therefore, be held vicariously liable on that basis for the harassment that created a

hostile work environment for Mack. For the reasons set forth below, we disagree.

Title VII[2] is violated "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (citation and internal quotation marks omitted). To survive a motion for summary judgment, a plaintiff claiming he or she was the victim of an unlawful hostile work environment must elicit evidence from which a reasonable trier of fact could conclude "(1) that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of [his or] her work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer." *Richardson v. New York State Dep't of Corr. Serv.*, 180 F.3d 426, 436 (2d Cir.1999) (citation and internal punctuation omitted). The district court bypassed the first issue, granting summary judgment for Otis on this claim based on its resolution of the second issue: The court concluded that Mack had provided an insufficient basis to hold Otis liable for the allegedly discriminatory conduct.

### A. Hostile Work Environment

The district court assumed without deciding that Mack's workplace was "permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of her work environ-

---

**1.** Mack has abandoned her constructive discharge claim against the Union on appeal.

**2.** "Our consideration of claims brought under the state and city human rights laws parallels

the analysis used in Title VII claims." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 565 n. 1 (2d Cir.2000).

ment." *Mack*, 2001 WL 1636886, at *6, 2001 U.S. Dist. LEXIS 20917, at *17–*18 (quoting *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 715 (2d Cir.1996)) (internal quotation marks omitted). We think it clear from the evidence described above construed in the light most favorable to the plaintiff that "the record taken as a whole could . . . lead a rational trier of fact to find," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), that Mack's "workplace [was] permeated with discriminatory intimidation, ridicule, and insult, . . . sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Harris*, 510 U.S. at 21, 114 S.Ct. 367 (citation and internal quotation marks omitted). Her claim thus survives the defendants' motion for summary judgment on this issue. The dispositive question with respect to the hostile work environment claim on Otis's motion to dismiss, to which we now turn, is therefore whether "a specific basis exists for imputing the conduct that created the hostile environment to [Otis]." *Van Zant*, 80 F.3d at 715.

### B. Imputing Liability to Otis

■ *1. Determining Whether Connolly Was Mack's "Supervisor."* The starting point for analyzing employer vicarious liability in a Title VII hostile work environment action is to determine whether the person who allegedly created that environment is properly characterized as having been the plaintiff's "supervisor." According to *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), and *Faragher v. City of Boca Raton*, 524 U.S. 775, 807,

118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), which together provide the bedrock upon which the current law of vicarious liability in Title VII hostile work environment cases is built, it is only when a "supervisor with immediate (or successively higher) authority over the employee" has engaged in the complained of conduct, that the "employer [may be] subject to vicarious liability." *Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257; *Faragher*, 524 U.S. at 807, 118 S.Ct. 2275 (1998).[3] Employers are not, by contrast, vicariously liable for a hostile work environment created by a mere co-worker of the victim.

■ Vicarious liability for supervisor harassment draws on, but is not exclusively derived from, principles of agency. *Ellerth* begins its discussion of vicarious liability under Title VII with an examination of those principles as set forth in the Restatement (Second) of Agency (1958) (the "Restatement"). The *Ellerth* Court acknowledged that harassment by one employee of another is not ordinarily an act within the harasser's scope of employment and that the employer is therefore not ordinarily vicariously liable for the creation of a hostile work environment on that basis. *Ellerth*, 524 U.S. at 756–57, 118 S.Ct. 2257. But under section 219(2) of the Restatement, an employer may be held liable for the actions of an employee even when they are outside the scope of employment. Such liability may arise, for example, if the employee "was aided in accomplishing the tort by the existence of the agency relation." Restatement, § 219(2)(d). *See Ellerth*, 524 U.S. at 758, 118 S.Ct. 2257.

**3.** Although prior to *Ellerth* and *Faragher* we discussed at length the vicarious liability of employers for the actions of their supervisors, *Torres v. Pisano*, 116 F.3d 625, 633–35 (2d Cir.), *cert. denied*, 522 U.S. 997, 118 S.Ct. 563, 139 L.Ed.2d 404 (1997), we have not reconsidered the standard for determining who is a supervisor in light of these relatively recent Supreme Court decisions.

The Court noted, though, that in a sense and to an extent, all workplace harassers are aided in their misbehavior by the agency relationship with their employer, because "[p]roximity and regular contact may afford a captive pool of potential victims." *Id.* at 760, 118 S.Ct. 2257. It does not follow, however, that employers are vicariously liable for all workplace harassment. "[S]omething more than the employment relation itself" must be established before the employer will be saddled with liability for the employee's misbehavior. *Id.*

*Ellerth* went on to discuss two different situations in which the employer and misbehaving employee have "something more than the employment relation" sufficient to give rise to vicarious liability. One such class of cases is that in which, in the course of creating or maintaining a hostile work environment, "a supervisor takes a tangible employment action against the subordinate," *id.,* because

> [w]hen a supervisor makes a tangible employment decision, there is assurance the injury could not have been inflicted absent the agency relation.... The supervisor has been empowered by the company as a distinct class of agent to make economic decisions affecting other employees under his or her control.
>
> . . . .
>
> For these reasons [among others], a tangible employment action taken by the supervisor becomes for Title VII purposes the act of the employer. Whatever the exact contours of the aided in the agency relation standard, its requirements will always be met when a supervisor takes a tangible employment action against a subordinate.

*Id.* at 761–63, 118 S.Ct. 2257; *see also Jin v. Metro. Life Ins. Co.,* 310 F.3d 84, 92 (2d Cir.2002) (quoting *Ellerth,* 524 U.S. at 761–62, 118 S.Ct. 2257).

The Court therefore held that if behavior illegal under Title VII culminates in a supervisor's tangible employment action, the employer will, *ipso facto,* be vicariously liable for it. "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* at 761, 118 S.Ct. 2257. The tangible employment action is "the means by which the supervisor brings the official power of the enterprise to bear on subordinates." *Id.* at 762, 118 S.Ct. 2257. It is the use of the economic power of the employer exercised by the employee to whom that power has been delegated that renders the employer liable. *See id.* And it seems unlikely that an employment action with economic dimensions taken by one employee with respect to another would entirely escape the knowledge of the employer's managers.

There is a second class of cases where the agency relationship between employer and supervisor facilitates the creation of a hostile work environment, *Ellerth,* 524 U.S. at 763, 118 S.Ct. 2257; *Faragher,* 524 U.S. at 803, 118 S.Ct. 2275, albeit in a "less obvious" way, *Ellerth,* 524 U.S. at 763, 118 S.Ct. 2257. In cases in which "supervisor harassment ... does not culminate in a tangible employment action," *id.,* the employer may also be held vicariously liable for the supervisor's harassing behavior, but such liability is not established simply by establishing that the misbehaving employee is the victim's supervisor; the "risk of [imposing] automatic liability [in these situations] is high," *Faragher,* 524 U.S. at 804, 118 S.Ct. 2275.

To fashion a rule of vicarious liability to apply to such cases, the Court looked not only to agency principles, but also to "other considerations" of Title VII, *Ellerth,* 524

U.S. at 764, 118 S.Ct. 2257, especially "Title VII's ... basic policies of encouraging forethought by employers and saving action by objecting employees," *id.* at 764, 118 S.Ct. 2257; *Faragher*, 524 U.S. at 807, 118 S.Ct. 2275. The Court concluded that where a tangible employment action is not involved:

> [the] employer is [nonetheless] subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate ... authority over the employee. [But in such cases] a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence .... The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

*Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257; *Faragher*, 524 U.S. at 807, 118 S.Ct. 2275.

██ The existence of a tangible employment action thus affects whether the affirmative defense is available, but it does not affect the preliminary assessment of whether the employer may be held vicariously liable for the actions of a misbehaving employee. Vicarious liability, whether automatic or subject to the affirmative defense, depends on whether the power—economic *or otherwise*, of the harassing employee over the subordinate victim given by the employer to the harasser—enabled the harasser, or materially augment-

ed his or her ability, to create or maintain the hostile work environment.

"It is precisely because the supervisor is understood to be clothed with the employer's authority that he is able to impose unwelcome sexual conduct on subordinates." *Ellerth*, 524 U.S. at 763, 118 S.Ct. 2257 (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 77, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (Marshall, J., concurring in judgment) (internal punctuation omitted)). "[A] supervisor's power and authority invests his or her harassing conduct with a particular threatening character, and in this sense, a supervisor always is aided by the agency relation." *Id.* "[T]he victim[, moreover,] may well be reluctant to accept the risks of blowing the whistle on a superior." *Faragher*, 524 U.S. at 803, 118 S.Ct. 2275.

██ We conclude from facts undisputed in the record on this appeal that Connolly's authority over Mack, bestowed upon him by Otis, enabled him, or materially augmented his ability, to impose a hostile work environment on her.[4] Under the rules established by *Ellerth* and *Faragher*, Connolly was therefore Mack's supervisor for purposes of Title VII analysis. Not only did he direct the particulars of each of Mack's work days, including her work assignments, he was the senior employee on the work site. He therefore possessed a special dominance over other on-site employees, including Mack, arising out of their remoteness from others with authority to exercise power on behalf of Otis. There was no one superior to Connolly at 200 Park whose continuing presence might have acted as a check on Connolly's coercive misbehavior toward other Otis employees there. Otis may therefore, subject to the affirmative defenses recognized

---

**4.** The existence and extent of such conduct, as opposed to the relationship among Otis, Con-

nolly and Mack, is of course hotly disputed.

in *Ellerth* and *Faragher*, be held vicariously liable for Connolly's creation of a hostile work environment for Mack.

The district court concluded to the contrary that Connolly possessed an insufficient amount of authority over Mack to be classified as her supervisor for these purposes. *Mack*, 2001 WL 1636886, at \*6–\*7, 2001 U.S. Dist. LEXIS 20917, at \*19–\*24. In doing so, the court relied in large measure on *Parkins v. Civil Constructors of Illinois, Inc.*, 163 F.3d 1027 (7th Cir.1998). *See Mack*, 2001 WL 1636886, at \*6–\*7, 2001 U.S. Dist. LEXIS 20917, at \*19–\*24. According to *Parkins*,

> it is manifest that the essence of supervisory status is the authority to affect the terms and conditions of the victim's employment. This authority primarily consists of the power to hire, fire, demote, promote, transfer, or discipline an employee. Absent an entrustment of at least some of this authority, an employee does not qualify as a supervisor for purposes [of] imputing liability to the employer.

163 F.3d at 1034.[5] It is undisputed that Connolly had no such authority with respect to Mack. The district court therefore concluded that Connolly was not Mack's supervisor and that Otis therefore could not be held vicariously liable for Connolly's misbehavior, if any.

We disagree. The *Parkins* test for determining who is a supervisor focuses on those attributes of an employee that enable him or her to take tangible employment actions with respect to subordinates: "the power to hire, fire, demote, promote, transfer, or discipline an[other] employee." *Parkins*, 163 F.3d at 1034. But as we have seen, *Ellerth* and *Faragher* hold that an employer may be vicariously liable even for the misbehavior of employees who do *not* take tangible employment actions against their subordinate victims. The question in such cases is not whether the employer gave the employee the authority to make economic decisions concerning his or her subordinates. It is, instead, whether the authority given by the employer to the employee enabled or materially augmented the ability of the latter to create a hostile work environment for his or her subordinates. We therefore conclude that the authority that renders a person a supervisor for purposes of Title VII analysis is broader than that reflected in the *Parkins* test.

To be sure, other courts have adopted the *Parkins* definition of supervisor.[6] For the reasons set forth above, however, we agree with those courts that have not defined supervisor so narrowly. *See, e.g., Dinkins v. Charoen Pokphand USA, Inc.*, 133 F.Supp.2d 1254, 1266 (M.D.Ala.2001) ("[A]n employee is a supervisor or 'agent' for purposes of Title VII if he has the actual authority to ... direct another employee's day-to-day work activities in a manner that may increase the employee's

---

**5.** The district court also cited *Trigg v. New York City Transit Auth.*, 2001 WL 868336, at \*7 (E.D.N.Y. July 26, 2001), 2001 U.S. Dist. LEXIS 10825, at \*22 (adopting the *Parkins* definition of supervisor as one who has "the power to hire, fire, demote, promote, transfer, or discipline an employee"), *aff'd*, 2002 WL 1900463 (2d Cir. Aug. 16, 2002), 2002 U.S.App. LEXIS 17355; *Jackson v. T & N Van Serv.*, 86 F.Supp.2d 497, 501 (E.D.Pa.2000) (citing with approval the *Parkins* definition of supervisor); and *Mikels v. City of Durham*,

183 F.3d 323, 334 (4th Cir.1999) (considering, in concluding that the allegedly harassing employee was not the plaintiff's supervisor, that the employee did not have the power to take tangible employment actions against the plaintiff), in support of the test it employed to determine whether Connolly was Mack's supervisor. *Mack*, 2001 WL 1636886, at \*7, 2001 U.S. Dist. LEXIS 20917, at \*21–\*22.

**6.** *See supra* note 5.

workload or assign additional or undesirable tasks."); *see also Kent v. Henderson,* 77 F.Supp.2d 628, 634 (E.D.Pa.1999) (considering whether the employee has the authority to "affect [the victim's] daily work activities" in determining whether the employee could be considered the victim's supervisor).

 We also draw support from the Equal Employment Opportunity Commission ("EEOC") enforcement guidelines. In discussing employers' vicarious liability, the guidelines state that "[a]n individual qualifies as an employee's 'supervisor' if: (a) the individual has authority to undertake or recommend tangible employment decisions affecting the employee; *or* (b) [t]he individual has authority to direct the employee's daily work activities." EEOC Enforcement Guidance on Vicarious Employer Liability for Unlawful Harassment by Supervisors, 8 FEP Manual (BNA) 405:7654 (1999) (emphasis in original). While we are not bound by enforcement guidelines, they are entitled to respect to the extent that they are persuasive. *See Jin,* 310 F.3d at 94–95 (relying on an EEOC Enforcement Guidance as persuasive authority); *Christensen v. Harris County,* 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000) (agency interpretations of ambiguous statutes, contained in "opinion letters ... policy statements, agency manuals, and enforcement guidelines ... lack the force of law" but are "entitled to respect ... to the extent that those interpretations have the power to persuade") (citation and internal quotation

marks omitted); *McMenemy v. City of Rochester,* 241 F.3d 279, 284 (2d Cir.2001) (finding persuasive the EEOC's interpretation of Title VII's retaliation clause). For the reasons discussed above, we find the EEOC's definition of "supervisor" in this context to be persuasive.

It is uncontested that Connolly was the senior employee regularly on site and that, as the mechanic in charge, he had and exercised the authority to make and oversee the daily work assignments of the mechanics and mechanics' helpers at 200 Park, including Mack. We conclude that, as a matter of law, Connolly was Mack's supervisor for purposes of imputing liability to Otis and that Otis may be vicariously liable for Connolly's acts toward Mack that violate Title VII. But because Connolly's harassment did not involve a tangible employment action, Otis cannot be held vicariously liable if Otis can establish the affirmative defense set forth in *Ellerth* and *Faragher.*

 *2. Otis's Affirmative Defense.* It is undisputed that Connolly's creation of a hostile work environment for Mack did not culminate in a tangible employment action rendering Otis automatically liable for his misbehavior.[7] As noted repeatedly above, in the absence of such a tangible employment action, Otis is entitled to an affirmative defense "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportu-

---

**7.** Mack has argued that she was constructively discharged as a result of the hostile work environment that Connolly created. But a constructive discharge does not constitute a tangible employment action for present purposes. *Caridad v. Metro–North Commuter R.R.,* 191 F.3d 283, 294 (2d Cir.1999), *cert. denied,* 529 U.S. 1107, 120 S.Ct. 1959, 146 L.Ed.2d 791 (2000).

Mack does not allege that she was subjected to any other tangible employment action. Mack testified at her deposition that "[t]owards the end when things got bad with Connolly he gave me very little [overtime]." Mack Dep. at 109. (A 469) Mack does not argue, however, that this constituted a tangible employment action, and we therefore do not consider whether it did.

nities provided by the employer or to avoid harm otherwise." *Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257; *Faragher*, 524 U.S. at 807, 118 S.Ct. 2275.

One way for employers to demonstrate that they exercised reasonable care is to show that they had an anti-harassment policy in place:

> An employer need not prove success in preventing harassing behavior in order to demonstrate that it exercised reasonable care in preventing and correcting sexually harassing conduct. Although not necessarily dispositive, the existence of an anti-harassment policy with complaint procedures is an important consideration in determining whether the employer has satisfied the first prong of this defense.

*Caridad v. Metro–North Commuter R.R.*, 191 F.3d 283, 295 (2d Cir.1999), *cert. denied*, 529 U.S. 1107, 120 S.Ct. 1959, 146 L.Ed.2d 791 (2000). Otis had a "Policy on Harassment in the Workplace," and Mack concedes that she knew about it. The critical question is therefore whether Mack availed herself of the avenues that the policy provided through which she might have alerted Otis to her situation.

Otis's policy requires aggrieved employees to inform their "supervisor, unless he/she is the alleged harasser." Otis Elevator Co. Policy on Harassment in the Workplace. Mack testified at her deposition that in November 1999, she repeatedly complained to Gallina, Connolly's supervisor, and that she asked Gallina to transfer her to a different department so that she would not have to work with Connolly. Mack says she told Gallina that she was "plagued with a lot of sexist issues with [Connolly]," Mack Dep. at 86, and that Connolly was "always making rude and sexist comments" to her, *id.* at 205. There is thus evidence in the record from which a reasonable trier of fact could conclude that

Mack did not "fail[ ] to take advantage" of Otis's harassment complaint procedures. *Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257.

## II. Constructive Discharge Claim

The district court also concluded that Mack failed to establish a triable issue of fact with respect to her constructive discharge claim. "Constructive discharge of an employee occurs when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily. Working conditions are intolerable if they are so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 73 (2d Cir.2000) (citation and internal quotation marks omitted). To prevail on a claim of constructive discharge, a plaintiff must show "deliberate action on the part of the employer.... [S]omething beyond mere negligence or ineffectiveness is required." *Id.* at 74.

The district court concluded that Mack had failed to provide evidence of intentional or deliberate action by Otis that forced her to resign. *Mack*, 2001 WL 1636886, at *11, 2001 U.S. Dist. LEXIS 20917, at *38. We agree. It is uncontested that once Otis officials were made aware of Mack's complaints, they immediately began an investigation. They arranged a meeting with Mack and offered to do precisely what she had asked, to transfer her to a place elsewhere in midtown Manhattan—Rockefeller Center—where she would be beyond Connolly's power. Mack simply refused the transfer and failed to return to work. As the district court concluded, no reasonable fact finder could construe this as a constructive discharge.

## III. Failure to Represent Claim

The district court also correctly concluded that Mack failed to demonstrate that Local 1 breached its duty to represent her. *Mack,* 2001 WL 1636886, at *13–*14, 2001 U.S. Dist. LEXIS 20917, at *43–*47. To establish a breach of duty of fair representation "[t]he union's conduct must, first, have been arbitrary, discriminatory or in bad faith, and second, it must have seriously undermine[d] the arbitral process." *Barr v. United Parcel Serv.,* 868 F.2d 36, 43 (2d Cir.1989) (citations and internal quotation marks omitted). There is no evidence that would support a finding that the Union acted arbitrarily or in bad faith in permitting the alleged violation of the CBA to go uncorrected. The CBA states that an employee seeking to file a grievance "shall first discuss the issue with his/her supervisor and/or business agent." CBA at 35. To request the Union to file a grievance against a Union member, the CBA instructs that "a written charge ... shall be filed with the Executive Board." Orriga Dep. at 43–44.

Mack alleges that she repeatedly complained of Connolly's conduct to Union shop steward Craig Reiff. But Mack also testified that she never asked Reiff to file a grievance for her, and that instead she asked him to help reassign her to a different location. Mack failed to comply with the Union's grievance procedures by not requesting that a grievance be filed against Otis or filing a written charge against Connolly. There is no evidence that the Union's actions in failing to file a grievance were "arbitrary, discriminatory, or in bad faith." Local 1 never filed a grievance because Mack never requested that it do so.

## IV. Retaliation Claim

Lastly, the district court concluded, correctly in our view, that Mack did not successfully establish a prima facie case of retaliation against either Otis or Local 1. *Mack,* 2001 WL 1636886, at *12, 2001 U.S. Dist. LEXIS 20917, at *39–*42. In order to establish such a prima facie case, a plaintiff must demonstrate that "(1) she was engaged in an activity protected under Title VII; (2) the employer was aware of plaintiff's participation in the protected activity; (3) the employer took adverse action against plaintiff; and (4) a causal connection existed between the plaintiff's protected activity and the adverse action taken by the employer." *Gordon v. New York City Bd. of Educ.,* 232 F.3d 111, 116 (2d Cir.2000) (citation omitted).

Mack alleges that she engaged in protected activity by reporting Connolly's conduct to, *inter alios,* Gallina and Reiff. She alleges that she was subjected to several adverse employment actions because of this activity, including escalation of the hostile work environment, constructive discharge, Local 1's refusal to file a formal grievance for her, and Otis's threat to transfer Mack to a different location.

Neither these assertions nor anything else we have found in the record would support a reasonable fact-finder's conclusion that Connolly's behavior toward her was retaliatory. Mack has not elicited any evidence to support the notion that Connolly was aware of her complaints to Gallina or Reiff, or that as a result of this awareness he engaged in or escalated the hostile work environment to which he subjected her. As noted, Local 1 did not file a grievance for Mack while she was employed by Otis because she did not cooperate with Union officials or follow Union procedures with respect to any such grievance. Finally, Mack's own testimony permits no inference that Otis's offer to transfer Mack away from Connolly to a

different location was anything other than an attempt to ameliorate the situation.

## CONCLUSION

For the foregoing reasons, the district court's judgment dismissing Mack's complaint is affirmed except for her hostile work environment claim under Title VII and New York State and City law, as to which the judgment is vacated and the case remanded to the district court for further proceedings consistent with this opinion.