**Hugh PAYNE, Plaintiff,**

v.

**MTA NEW YORK CITY TRANSIT AUTHORITY, Defendants.**

**No. 99 CV 3210(NG)(CLP).**

United States District Court, E.D. New York.

Dec. 21, 2004.

Leeds, Morelli & Brown by Robert Valli, Jr., Carle Place, NY, for plaintiff.

Martin B. Schnabel, General Counsel, NYCTA by Daniel Topper, Brooklyn, NY, for defendant.

## OPINION AND ORDER

GERSHON, District Judge.

Plaintiff Hugh Payne, who worked in the Human Resources ("HR") department at defendant MTA New York City Transit Authority ("NYCTA") for fifteen years, brings this action alleging employment discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e–17 ("Title VII"), the New York State Human Rights Law, N.Y. Exec. Law §§ 290–301 ("State HRL"), and the New York City Human Rights Law, N.Y. City Admin. Code §§ 8–101–8–131. ("City HRL"). Plaintiff claims that the NYCTA discriminated against him because of his race and subjected him to a hostile work environment. He further claims that he suffered retaliation after filing a charge with the Equal Employment Opportunity Commission ("EEOC"). Defendant moves for summary judgment, arguing that (1) certain claims made by plaintiff are barred because plaintiff failed to include them in a timely filed EEOC charge, (2) defendant is entitled to judgment as a matter of law on plaintiff's remaining discrimination claims, (3) defendant is entitled to judgment as a matter of law on plaintiff's retaliation claim, and (4) defendant is entitled to judgment as a matter of law on plaintiff's state and local law claims. For the reasons set forth below, defendant's motion is granted.

### FACTS

The following background facts are not in dispute; additional undisputed facts are set forth *infra*. Payne, who identifies himself as a black male, was hired by the NYCTA as a Finance Manager in the HR department in February 1986. One year later, he was promoted to Deputy Director of Budget, and two years after that, he was promoted to Director of Budget and Administration. In that position, he reported to Charles Teggatz, Vice President

for Budget and Administration. Teggatz, in turn, reported to Liz Lowe, Vice President for the entire HR department. Teggatz is white and Lowe is black. In September 1990, Payne received a 10% salary increase. In June 1992, Payne was promoted to Senior Director of Budget and Administration. He received another 10% salary increase and continued to report to Teggatz. In June 1993, June 1994, and June 1996, Payne received 4% salary increases. In July or August 1996, Payne was promoted to Assistant Vice President ("AVP") for Administration and Budget. He did not receive a salary increase at that time. He began reporting to Sandra Williams, Deputy Vice President for Employee Development and Training. Williams also reported to Lowe. Williams is black.

During Lowe's tenure as department head, department-wide staff meetings were held on a regular basis. Attendees included Lowe; Williams; Teggatz; Robert Kayer, AVP for Occupational Health Services; Brian Semler, AVP for Field Services; Linda Feeny, AVP for Strategic Planning; and Payne. Kayer, Semler, and Feeny are white. During these meetings, Payne would be called upon routinely to make presentations concerning the budget. The presentations were typically subjected to a high level of scrutiny. Payne's colleagues would ask detailed questions and request that back-up data be provided. Members of Payne's staff were also called upon, from time to time, to make budget presentations at Lowe's staff meetings.

In fall 1996, Lowe resigned her position, and Teggatz took over as Acting Vice President for HR. He remained in that position until May 1997, when Kevin Hyland was appointed Vice President for HR. Hyland is white. Hyland instituted a major reorganization of the HR department, which resulted in Williams' title being reduced one level to Assistant Vice President, Payne's title being reduced one level to Senior Director, and several assistant vice presidents, including Teggatz, and Kayer being transferred out of the department. Neither Williams nor Payne received a pay cut. During the tenures of Teggatz and Hyland as department head, department-wide staff meetings were not held regularly.

On February 13, 1998, Payne was injured in a car accident. He was out of work until April 1998. In Payne's absence, Williams assigned his responsibilities to other members of her staff. Upon Payne's return to work, Williams did not return to him any responsibilities concerning the budget. Instead, she offered him the opportunity to work on an infrastructure project. Payne informed her that he could handle the project in addition to his regular workload, but Williams told him that the position would be full-time. Payne declined it. In July 1998, Williams offered Payne the opportunity to lead a special telecommunications initiative. Again, she told him that it would be a full time position and, again, he declined it. On September 28, 1998, Williams informed Payne that she was reorganizing her staff. Donna James, who formerly reported to Payne, would be promoted to head of the administrative unit. James is black. Payne would now be in charge of the facilities area and would report to James. Although Payne did not consent to these changes, they were announced at a staff meeting the following day. Payne was instructed to vacate his current office and move to a different office in the building. While packing the contents of his file cabinet, Payne reinjured his back. He was out of work until February 1999.

On December 4, 1998, Williams contacted Payne to advise him that an independent medical examination by doctors

affiliated with the workers' compensation program indicated that he would be able to return to work on December 9, 1998. On December 7, 1998, Payne filed a charge with the EEOC. Following his return to work in February 1999, Payne left early each day on instructions from his doctor. Williams directed that his time sheets indicate that he was absent without official leave ("AWOL") during these periods. In March 1999, Payne received an employee review from Williams that rated his performance in certain areas as marginal. In May 1999, James decided to reduce the number of beepers available to her unit. She instructed all personnel who reported directly to her, including Payne, to turn in their beepers. Subsequently, one beeper was assigned to the entire unit and maintained by James. Payne was required to go to her office and sign it out when he wanted to use it.

Payne commenced this lawsuit on June 7, 1999. His complaint alleged discrimination on the bases of race, color, ethnicity and national origin in violation of Title VII, the State HRL, and the City HRL. At oral argument, he withdrew all alleged bases of discrimination other than race. His complaint also alleged retaliation in violation of Title VII and the State HRL. Since the commencement of this action, Payne has retired from the NYCTA on disability.

## DISCUSSION

### I. Standard for Summary Judgment

Summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Rule 56(c) mandates the entry of summary judgment, after ade-quate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The standard for granting summary judgment mirrors the standard for a directed verdict under Rule 50(a), which permits the court to grant a motion for judgment as a matter of law when "there is no legally sufficient evidentiary basis for a reasonable jury" to decide an essential issue in favor of the non-moving party. Fed.R.Civ.P. 50(a)(1); *see id.* at 323.

When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). To prevail, the non-moving party must come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *id.* at 587. A complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial, and entitles the moving party to judgment as a matter of law. *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. 2548.

In employment discrimination actions, courts are cautious about granting summary judgment when intent is at issue. This is because "a victim ... [is] seldom able to prove his or her claim by direct evidence and is usually constrained to rely on the cumulative weight of circumstantial evidence." *Rosen v. Thornburgh,* 928 F.2d 528, 533 (2d Cir.1991); *accord Gallo v. Prudential Residential Services,* 22 F.3d 1219 (2d Cir.1994). Nevertheless, "the sa-

lutary purposes of summary judgement-avoiding protracted, expensive and harassing trials- apply no less to discrimination cases than to ... other areas of litigation." *Weinstock v. Columbia University,* 224 F.3d 33, 41 (2d Cir.2000) (quoting *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985)). Thus, summary judgment "is appropriate even in discrimination cases" when the standards of Rule 56 have been met. *Weinstock,* 224 F.3d at 41.

## II. Procedural Requirements of Title VII/Hostile Work Environment Claim

██ As a pre-requisite to filing a civil action, Title VII requires an individual seeking relief for employment discrimination to file a charge with the EEOC. 42 U.S.C. § 2000e–5(f)(1). In jurisdictions, such as this one, in which there exists an agency charged with enforcing state or local prohibitions against employment discrimination, the statute provides a 300 day limitations period for filing such charge. 42 U.S.C. § 2000e–5(e)(1). Allegations of discrete acts of discrimination that occurred prior to the 300 day period are time-barred, even if related to acts that occurred within the 300 day period. *National Railroad Passenger Corp. v. Morgan,* 536 U.S. 101, 113, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). Allegations of a hostile work environment, however, will not be time-barred so long as all acts that constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period. *Morgan,* 536 U.S. at 122, 122 S.Ct. 2061. Here, Payne filed his EEOC charge on December 7, 1998, so the 300 day period extends backward in time to February 11, 1998, two days prior to Payne's car accident.

██ In response to the NYCTA's motion for summary judgment, Payne argues for the first time that he was subjected to a hostile work environment. Even if Payne's hostile work environment claim were properly exhausted, which it does not appear to be, and he were allowed to amend the complaint to add it, the claim would have to be dismissed. To survive a motion for summary judgment, a plaintiff claiming to be the victim of a hostile work environment must elicit evidence from which a reasonable trier of fact could conclude, *inter alia,* that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of plaintiff's work environment. *Mack v. Otis Elevator Co.,* 326 F.3d 116, 122 (2d Cir.2003). In determining whether the workplace was permeated with the requisite discriminatory intimidation, a court must look to all of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with an employee's work performance. *Morgan,* 536 U.S. at 116, 122 S.Ct. 2061; *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment- an environment that a reasonable person would find hostile or abusive- is beyond Title VII's purview. *Harris,* 510 U.S. at 21, 114 S.Ct. 367.

In *Harris,* the Supreme Court found that a hostile work environment existed where the plaintiff's supervisor frequently insulted her because of her gender, made her the target of unwanted sexual innuendo, suggested that she accompany him to the Holiday Inn to negotiate her raise, asked her and other female employees to get coins from his front pants pocket, and threw objects on the ground in front of her

and other women, then asked them to pick the objects up. 510 U.S. at 19, 114 S.Ct. 367. In *Morgan*, the Court upheld a finding that an actionable hostile work environment claim existed where the plaintiff alleged that discriminatory acts occurred with relative frequency and were perpetrated by the same set of managers, and presented evidence from a number of other employees that managers made racial jokes, performed racially derogatory acts, made negative comments regarding the capacity of blacks to be supervisors, and used various racial epithets. 536 U.S. at 121, 122 S.Ct. 2061.

■ Here, Payne argues that the following conduct created a hostile work environment: During the summer of 1996, he received a promotion to AVP for Administration & Budget without a corresponding pay raise. Prior to May 1997, when Lowe was the Vice President for HR, he was questioned and criticized at staff meetings to a greater degree than white counterparts. Following the appointment of Hyland to Vice President in May 1997, a department-wide reorganization took place that led to a reduction in Payne's title and a decrease in his responsibilities and staff. In September 1998, Payne was reassigned within his department, made to report to a former subordinate, relocate his office, pack his own file cabinet, and turn in his beeper. In addition, Payne claims that special projects were offered to him on a conditional basis only, whereas they were offered to his white colleagues on an unconditional basis.

Even if Payne could demonstrate that this conduct was racially motivated, it is neither severe nor pervasive enough to create a hostile work environment. The conduct described by Payne occurred intermittently over a period of years, involving different managers at different times. When questioned at his deposition, Payne was unable to offer any specific details about the criticism he complains occurred at staff meetings. He does not submit testimony from other NYCTA employees to support his claims. Notably, Payne testified that no one in the office ever made racially offensive remarks in his presence, and he had no knowledge of any such remarks having been made outside his presence. Payne Dep. IV at 24. While this is not dispositive of the existence of a racially hostile work environment, it is one of the circumstances that must factor into the court's analysis. Overall, Payne has failed to demonstrate that a pervasive environment of racial hostility existed at the NYCTA during his tenure there. The circumstances he describes are not analogous to those in *Harris* and *Morgan*. Payne's claims are best characterized as discrete instances of alleged discriminatory acts, each to be judged independently.

Accordingly, Payne's hostile work environment claim is rejected. In the absence of such claim, allegations concerning conduct that occurred prior to February 11, 1998 are time-barred under *Morgan*. As a result, the NYCTA's motion for summary judgment is granted with respect to these claims.

## III. Discrimination Claims

### A. McDonnell–Douglas Framework for Analysis

■ Title VII provides that it shall be "an unlawful employment practice" for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin ...." 42 U.S.C. § 2000e–2(a)(1). Under Title VII, claims of discrimination are analyzed using the burden-shifting framework set forth in

*McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Initially, the plaintiff must establish a prima facie case of discrimination. *Id.* at 802. To do this, the plaintiff must demonstrate that (1) plaintiff belongs to a protected class, (2) plaintiff was qualified to perform the duties of the job at issue, (3) plaintiff suffered an adverse employment action, and (4) the circumstances surrounding that action permit an inference of discrimination. *Williams v. R.H. Donnelley, Corp.,* 368 F.3d 123, 126 (2d Cir.2004). The plaintiff's burden of establishing a prima facie case is de minimis. *Abdu–Brisson v. Delta Air Lines, Inc.,* 239 F.3d 456, 467 (2d Cir.2001); *accord id.* Once a prima facie case of discrimination has been established, the employer must articulate a legitimate, non-discriminatory reason for having taken the action of which the plaintiff complains. *McDonnell Douglas Corp.,* 411 U.S. at 802–03, 93 S.Ct. 1817. If the employer does this, the burden shifts back to the plaintiff to prove that the allegedly legitimate reason is merely a pretext for discrimination. *Id.* at 804. "A reason cannot be proved to be a 'pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 515, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (citation omitted); *accord Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 146, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

## B. Adverse Employment Actions Alleged by Payne

Payne claims that he experienced two adverse employment actions, motivated by racial discrimination, subsequent to February 11, 1998. The first of these is his reassignment within the HR department in September 1998. The second is the negative review that he received in March 1999.

The court will address each of these separately.

### 1. Reassignment in September 1998

Payne argues that the staff reorganization undertaken by Williams in September 1998, which resulted in a change of his job responsibilities and supervisor, was motivated by an intent to discriminate against him because of his race. Payne asserts that Hyland and Williams conspired over a period of time to humiliate him and remove him from his position at the NYCTA. Concerning the September 1998 reassignment, Payne testified, "That was part of the plan to remove me from my position and I feel the reason it was done because I was black." Payne Dep. IV at 44–45.

In response, the NYCTA submits the testimony of Williams to establish a legitimate, nondiscriminatory reason for Payne's reassignment. Williams asserts that, in her view, Payne's performance declined in 1998. She attributes the decline to the fact that she "stopped coaching him" and "left him on his own to deliver." Williams Dep. at 45. She said that when she worked under Lowe and Teggatz, she had time to work with Payne one-on-one on all of his assignments. After Hyland took over, however, she had to devote more time to her own job tasks. Williams testified that:

> [B]oth Liz [Lowe] and Chuck [Teggatz] knew my track record. They knew what I was capable of. I could really carry the load for Hugh and continue that coaching that both Chuck and Liz supported. Then my new boss [Hyland] did not know me and I had to deliver and show him that I was capable of leading and managing and therefore I could not carry Hugh. I actually had to cease the coaching and the training and let him begin to work on his own as he should have been doing all along, and he was

left to do that. He had difficulty demonstrating and producing the type of leadership for that unit. You know, in problem solving areas and in the budget areas. Without that one-on-one coaching he just was not able to do it or he didn't do it." *Id.* at 46.

While Payne was out of the office following his car accident, Williams assigned his job tasks to others out of necessity; in particular, she assigned his budget tasks to the Strategic Planning Unit. She found that the members of this unit performed those tasks better than Payne had. Upon Payne's return to work in April 1998, she did not return the budget tasks to him because she "no longer had confidence in his ability to effectively control and actively report on budget issues." Williams Reply Aff. ¶ 5. Instead, she offered him alternative positions in the department, but Payne, who perceived these positions as "special projects," declined to accept them unless he could maintain responsibility for the budget. Payne Dep. IV at 41–44; Williams Dep. at 24–26. Finally, Williams reassigned him to the facilities position without his consent, directing him to report to James.

■ Payne offers no particularized evidence to rebut defendant's proffered explanation and demonstrate that racial discrimination was the real motive for his reassignment.[1] Notably, he offers no evidence to contest the factual assertion that members of the Strategic Planning Unit did a better job with the budget than he did. Nor does he contest the assertion that Williams "carried" him prior to Hyland's arrival. Moreover, Payne does not address the fact that both Williams, who made the decision to reassign him, and James, who was promoted above him, are black.

■ Under *McDonnell Douglas,* Payne bears the ultimate burden of proving that his reassignment was the result of racial discrimination. The only admissible evidence that he has submitted is his own unsubstantiated, subjective belief, embodied in his deposition testimony, that white and black colleagues at the NYCTA conspired to humiliate him and remove him from his position because of his race. No reasonable jury could conclude, based on that evidence alone, that he has carried his burden. Accordingly, the NYCTA's motion for summary judgment is granted with respect to this claim.

### 2. Negative Review in March 1999

The HR department conducted employee reviews of its managers on a periodic basis. The review forms listed a series of goals and skills- e.g., "results management," "organizing and planning skills," "leadership skills"- each followed by a rating and an explanation of the rating. An "overall rating" was also provided. Although the forms were modified over time, the rating system did not change during the time period relevant to this case. Ratings were given on a four point scale: A rating of "Excellent" indicated that "[p]erformance consistently exceeds expected requirements. Manager tackles complex goals and is generally recognize[d] as an important contributor and leader within the organization." A rating

---

1. Payne does report a conversation that he had with Dr. Lewis, the head of the NYCTA's medical department, following Lowe's departure. Payne testified that Lewis, who is black, cautioned him that "the powers that be" would seek to discredit and remove both Payne and himself. Payne inferred that Lewis was implying a racial motive. This testimony, however, is inadmissible hearsay. Payne submits no testimony from Lewis himself, nor any evidence to demonstrate that Lewis suffered harassment or discrimination at any time after making the statement to Payne.

of "Good" indicated that "[p]erformance is within expected levels of performance requirements, individual's goals are met and may occasionally be exceeded, and consistent good performance is relied upon." A rating of "Marginal" indicated that "[p]erformance is somewhat below job requirements in at least one or two areas. Manager needs to significantly improve in these areas in order to be considered Good." A rating of "Poor" indicated that "[p]erformance is significantly below job requirements. Manager is consistently not meeting job improvement expectations and higher levels of performance are needed to achieve a Marginal [level] of performance."

Five of Payne's employee reviews are in the record. A review by Teggatz dated December 13, 1993, for the period October 9, 1992–October 9, 1993, gives Payne mostly Excellent ratings and some Good ratings. The overall rating is Excellent. A review by Teggatz dated August 12, 1996, for the period June 15, 1994–June 15, 1996, gives Payne mostly Good ratings and some Excellent ratings. The overall rating is Good. A review by Teggatz dated October 30, 1997, for the period June 1996–June 1997, gives Payne mostly Good ratings and some Excellent ratings. The overall rating is Good. A review by Williams dated March 31, 1998, for the period June 15, 1997–December 31, 1997, gives Payne all Good ratings. The overall rating is Good. A review by Williams dated March 18, 1999, for the period 1998, gives Payne mostly Good ratings and some Marginal ratings. The overall rating is Good.

Payne argues that the marginal ratings he received, for the first time, in the March 18, 1999 review were motivated by racial discrimination. In response, Williams asserts that the March 18, 1999 review reflected the poor performance in 1998 that led to Payne's reassignment. As discussed *supra*, Williams testified that after she ceased working one-on-one with Payne, his job performance declined, and she lost confidence in him. In addition, following his injury, Payne became uncooperative and was frequently absent from work without official leave.

██ Again, Payne offers no specific facts to rebut Williams' assertions. He submits no testimony or documentary evidence concerning his job performance during the review period. Although he attempts to rebut the claim that he was absent without official leave with testimony that he submitted the paperwork necessary to excuse his absence, he does not provide any specific details about what documents he submitted, when he submitted them, or to whom he submitted them, and does not provide any records to substantiate his assertions.[2] Since Payne has failed to come forward with specific facts showing that there is a genuine issue for trial, as required by Rule 56(e), and has failed to meet his burden of proof under *McDonnell Douglas*, the NYCTA's motion for summary judgment is granted with respect to this claim.

## IV. Retaliation Claim

Payne claims that the March 18, 1999 review also constituted retaliation for his

---

**2.** The following testimony was given by Payne at a deposition by defendant's counsel:

    Q: So you are saying that you submitted a timely doctor's note; is that right?
    A: Whatever was needed I submitted.
    Q: Did you submit them timely?
    A: Whatever was needed I submitted. That part of the area that I was responsi-

ble for, the timekeeping area, so I know what the policies are and I wouldn't jeopardize my staff member by not submitting the documentation. So the documentation was submitted.

Payne Dep. IV at 86.

EEOC charge, filed on December 7, 1998. Title VII provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). Like claims of discrimination, claims of retaliation are analyzed using the *McDonnell Douglas* burden-shifting framework. To establish a prima facie case of retaliation, a plaintiff must demonstrate that (1) plaintiff was engaged in an activity protected under Title VII, (2) the employer was aware of plaintiff's participation in the protected activity, (3) the employer took adverse action against plaintiff, and (4) a causal connection existed between the plaintiff's protected activity and the adverse action taken by the employer. *Mack*, 326 F.3d at 129.

■ To meet his burden of proof, Payne relies solely on the timing of the review in relation to the filing of the EEOC charge: Before filing the charge, he never received a marginal rating; three months after filing the charge, he received several marginal ratings. But Payne's argument fails to take into account that his reviews indicate a steady decline in performance over time, from mostly Excellents and some Goods, to mostly Goods and some Excellents, to only Goods, to

mostly Goods and some Marginals. Moreover, Payne fails to submit any particularized evidence in support of his retaliation claim. In light of all the facts and circumstances of this case, documented in the record, no reasonable jury could conclude, based on the timing of the review alone, that a causal connection existed between Payne's EEOC charge and the March 18, 1999 review.[3] Accordingly, Payne has failed to establish a prima facie case of retaliation, and the NYCTA's motion for summary judgment is granted with respect to this claim.

### V. State and Local Law Claims

■ Since claims brought under the State HRL and City HRL are analyzed under the same substantive standards as claims brought under Title VII, summary judgment is granted in favor of defendant with respect to Payne's state and local law claims, as well. *See Mack*, 326 F.3d at 122 n. 2; *Abdu–Brisson*, 239 F.3d at 466.

### CONCLUSION

For the reasons set forth above, defendant's motion for summary judgment is granted in its entirety. The Clerk of Court is directed to enter judgment for the defendant.

### SO ORDERED.

---

**3.** In *Clark County School District v. Breeden*, 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001), the Supreme Court cast doubt on whether the timing of an adverse employment action could ever be sufficient, on its own, to establish a prima facie case of causality when it did not occur until months after the protected activity. In support of the statement that "cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close," the Court cited, *inter alia, Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir.1997), which held a three-month period to be too large a span to establish a causal connection.