**Kimberly S. DEMARS, Plaintiff,**

v.

**Patrick O'FLYNN, as Sheriff of Monroe County, Defendant.**

**No. 01–CV–6475 CJS.**

United States District Court,
W.D. New York.

Sept. 17, 2003.

Karen Sanders, Esq., Cegelski Legal Associates, PLLC, Rochester, NY, for Plaintiff.

Timothy Lexvold, Esq., Monroe County Department of Law, Rochester, NY, for Defendant.

## DECISION AND ORDER

SIRAGUSA, District Judge.

## INTRODUCTION

This is an action alleging employment discrimination and retaliation pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Now before the Court is defendants' motion [# 25] for summary judgment. For the reasons that follow, defendant's application is granted.

## BACKGROUND

Unless otherwise noted, the following are the facts of this case, viewed in the light most favorable to the plaintiff. In February 1999, plaintiff Kimberly DeMars ("plaintiff") was employed as a Monroe County Sheriff's Deputy and was assigned to Zone C. At that time plaintiff was assigned to work the night shift, known as First Platoon. Deputies who worked the First Platoon received a "shift differential," consisting of a "little extra pay."[1] DeMars Dep. P. 9. On February 19, 1999, during a traffic stop, a driver opened his car door and hit plaintiff in her knees with

---

1. Plaintiff has not indicated how much.

the car door. Plaintiff continued to work that night, and did not seek medical attention until two days later. Plaintiff then left work on work-related sick leave, for which she received full pay with no taxes deducted. With the exception of six days which plaintiff worked on light duty in August 1999, and as will be discussed further below, plaintiff remained out on sick leave with full pay for the next ten months.

At all relevant times, the Sheriff's Multi Bureau General Order 18–98 was in effect, pursuant to which supervisors were required to monitor employees' sick leave. Order 18–98 states, in relevant part:

> Employees of the Sheriff's Office will report sick only when suffering from an illness or injury that would prevent the performance of duty. They will not feign sickness or injury, deceive or attempt to deceive any physician, surgeon, superior officer or other competent authority concerning their physical condition . . . .
>
> * * * * * *
>
> Employees who are placed on extended sick leave status are not absolved of their responsibilities as set forth previously, relative to daily contacts with either Central Records or their supervisor.
>
> * * * * * *
>
> *It will be the responsibility of the commanding officer or supervisor granting such status to ... [i]nitiate frequent contacts with employees on extended sick leave and document such contacts and inquiries regarding their condition and status.*
>
> * * * * * *
>
> Employees on extended sick leave in excess of three days shall be required to notify their supervisor of any instance in which they will not be reachable for one full day or longer at their residence, and where they will be during such absence.
>
> * * * * * *
>
> Any employee who has reported as sick or injured, on or off duty, will report for limited duty as may be available and authorized by the Sheriff's physician.
>
> * * * * * *
>
> Employees shall fully cooperate with the Sheriff's physician regarding examinations and evaluations and will provide medical information as deemed necessary by the physician.
>
> * * * * * *
>
> Commanding officers and supervisors will review all sick records and be alert to suspected cases of excessive absenteeism or abuses of sick leave. If in their judgment there is an abuse they may immediately order the employee to the Sheriff's physician.
>
> * * * * * *
>
> *Commanding Officers and supervisors, or their designees may contact employees at any time while they are on sick leave status. In the event of a prolonged illness, contacts will be made no less than once each week.*

Lexvold Declaration, Exhibit F (emphasis added). At her deposition, plaintiff acknowledged that, pursuant to Order 18–98, her supervisor was entitled to contact her at home "whenever he want[ed] to," and that there was nothing to prevent her supervisor from contacting her "every day" that she was out on sick leave. DeMars Dep., p. 29.

At the time of her injury, plaintiff's supervisor at C Zone was Captain Neil Flood ("Flood"). Between February and June 1999, Flood contacted plaintiff at home to check on her condition. DeMars Dep. P. 29. In June 1999, Captain Theodore Wright ("Wright") replaced Flood as su-

pervisor of C Zone. At that time, Flood and Wright had a conversation regarding plaintiff:

> When I took over operation of Zone C, I was advised of her extended-sick-leave status by Major Flood, who I was replacing.... He advised me that Deputy DeMars was out with a knee injury, on duty, it occurred on duty, and that she had been out since approximately February.... She was the only one that was out for an extended period of time, to my recollection.... Major Flood had advised me that he hadn't been as diligent in monitoring Deputy DeMars's absence, and that was something that I would need to look at very closely and spend time on.... That I needed to contact her and check on her status, and see about getting her back, light duty.

Wright Dep., pp. 28, 30. Thus, when Wright assumed command of C Zone, plaintiff had been out on sick leave for approximately four months, and was the only deputy under Wright's command who had been on sick leave for an extended period. *Id.* Wright immediately began contacting plaintiff to monitor her sick leave. Between June and August, Wright called plaintiff a "few" times on the telephone to check on her condition. DeMars Dep., p. 36. According to plaintiff, on one such occasion, Wright indicated that he could not believe that plaintiff had suffered such a serious injury as a result of being hit with a car door. On another occasion, Wright asked her what she did during the day; more specifically, he asked her whether she stayed in bed all day, or whether she watched soap operas. *Id.* at 44.

Both plaintiff's personal physician and the Sheriff's Office physician cleared plaintiff to return to work as of May 17, 1999. However, plaintiff then began treating with a new physician, who indicated that she could not return to work until he re-evaluated her on June 9, 1999. On July 15, 1999, the Sheriff's physician determined that plaintiff could not return to work at that time. On August 5, 1999, the Sheriff's physician determined that plaintiff could return to light duty as of August 9, 1999, working four to five hours per day. On August 9, 1999, plaintiff did return to work on light duty, for four hours per day on day shift at C Zone in the Juvenile Unit. According to Wright, his superiors assigned plaintiff to C Zone because the building was "all on one level," with no stairs to climb, had parking close to the building, and was close to plaintiff's residence. Wright Dep., p. 39. Plaintiff did not request to work First Platoon (the night shift), nor did she indicate to anyone that she did not want to work the day shift at C Zone.

Plaintiff worked at C Zone for six days, from August 9, 1999 through August 16, 1999. Wright did not make any inappropriate comments to plaintiff during this period, and in fact, plaintiff does not recall having any conversations with Wright during the week she worked at C Zone in August 1999. At or around this time, plaintiff received at C Zone a package containing new uniform pants. On the package containing the pants, someone had written the words "no balls." Plaintiff informed a male sergeant of the incident, who seemed upset by it.[2] Plaintiff does not indicate that she informed her immediate supervisor of the incident. Further,

---

**2.** Plaintiff testified that she called the male sergeant and asked him to come to her house to see the package, which he did. DeMars Dep., p. 53. The Court notes that although, as will be discussed below, plaintiff complains herein that Wright should not have come to her house to check on her condition after her surgery, she had no objection to another male supervisor coming to her house for other work-related matters.

plaintiff does not know who wrote on the package. After being back to work six days, plaintiff requested four days of vacation (August 17–20), so that she could travel to Pennsylvania to pick up her son. Wright approved plaintiff's request. After her vacation, plaintiff did not return to work at Zone C, but instead, during the week of August 23–27, 1999, attended a week-long, eight-hour-per-day training class for D.A.R.E. instructors. Plaintiff was able to attend all of the classes that week. DeMars Dep., p. 68. Plaintiff did not inform Wright in advance that she would be attending this class. Instead, Wright learned that plaintiff would be attending the class through a departmental personnel order.

On August 31, 1999, plaintiff called Wright and informed him that she could not return to light-duty work because of increasing problems with her knee. That same week, Wright learned that plaintiff was enrolled to take two classes at a nearby college during the Fall 1999 semester. Wright learned of this when he received a request for reimbursement of plaintiff's tuition. Wright called plaintiff and told her that he believed that if she could attend classes, she could also return to work on light duty. DeMars Dep., p. 60 ("He basically said, if you can go to school, you can come and sit at C Zone for a few hours a day, was the gist of it."). Despite his opinion, Wright approved the tuition request, and plaintiff attended the classes. The two classes were each scheduled to meet once per week, and plaintiff attended the classes for the entire semester, with some interruptions due to her subsequent surgery. *Id.* at 62–63.

Plaintiff's extended absence, together with her ability to attend classes, caused Wright to become suspicious that plaintiff was abusing the sick leave policy, and in September 1999,[3] Wright asked the Sheriff's department of Internal Affairs to "monitor [plaintiff's] activity and verify her attendance at Roberts Wesleyan College." Lexvold Declaration, Exhibit S. Internal Affairs monitored plaintiff on several occasions, however the Sheriff's Office took no disciplinary action against plaintiff as a result of the investigation.

On September 8, 1999, plaintiff's physician informed Wright that plaintiff was scheduled to have surgery on her knee on October 5, 1999, and "remain[ed] totally disabled pending recovery from the surgery (approximately 6 to 8 weeks following surgery)."[4] According to plaintiff, between August 1999 and the date of her surgery, Wright called her "several" times to check on her condition. DeMars Dep., p. 56. On or about September 29, 1999, Wright attempted to call plaintiff using the telephone number that she had provided to

---

**3.** Internal Affairs' report is dated December 7, 1999, however, the report indicates that Internal Affairs began monitoring plaintiff as early as September 22, 1999. Lexvold Declaration, Exhibit S.

**4.** One of plaintiff's complaints in this action is that Wright allegedly insisted that plaintiff call him as soon as she got out of surgery, and she initially testified that Wright had directed her to call him literally the minute her surgery was completed. DeMars Dep., p. 71. However, upon further questioning, plaintiff testified as follows: "Q. He didn't tell you that the next day would be okay? A. I don't, I

don't really remember. I just remember him telling me he really wanted me to call when I got done because he wanted to know what was going on." *Id.*, p. 72. Plaintiff's notes, on the other hand, which she contends were contemporaneously made, indicate that Wright said "Do me a favor, call me after you have surgery that night *or the next day*," and that after plaintiff told him she "probably wouldn't feel up to it," Wright said, "Give me a holler [on] Wednesday," which would have been the day following surgery, October 6, 1999. DeMars Aff., Exhibit A (emphasis added).

the Sheriff's Office, and found that it had been disconnected. Wright then contacted the telephone company and obtained another, unlisted, telephone number for plaintiff's home. As part of this action, plaintiff contends that it was improper for Wright to obtain and use her unlisted home telephone number. However, during her deposition, plaintiff admitted that she was required to provide the Sheriff's Office with a home telephone number where she could be reached, even if the number was unlisted. Specifically, pursuant to Sheriff's Office Order 5.7, deputies were required to provide the Sheriff's Office with a telephone number where they could be reached off duty, and to notify the Sheriff's Office of any change to such number within 24 hours.

In November 1999, approximately one month after plaintiff's surgery, Wright stopped at plaintiff's house, which was located on a main thoroughfare, to check on her. Plaintiff was not home at the time, however, there was a car in the driveway, and her two sons were at home. Wright went to the front door of the house, and when no one answered, he went to the back door of the house and peered in the window, then left. When plaintiff's sons informed her that Wright had been at the house, she called Wright, and he acknowledged that he had been there. Plaintiff also saw Wright drive by her house on a few other occasions.

Wright continued to call plaintiff, and on December 3, 1999, at Wright's request, the Sheriff's physician contacted plaintiff's physician, who indicated that plaintiff remained totally disabled. In late December 1999, plaintiff filed a complaint with Internal Affairs, alleging that Wright was harassing her by calling her on the telephone and visiting her home on the one occasion in November. Wright learned of plaintiff's complaint on December 21, 1999. There-

after, due to the pending complaint, Wright had no further contact with plaintiff in connection with her sick leave.

On January 11, 2000, plaintiff's physician indicated that plaintiff could return to work at a light-duty desk job for up to five hours per day for the first two weeks, and then full time thereafter. Plaintiff was assigned to work the day shift downtown in the Sheriff's Office Training Unit, in which capacity plaintiff earned more "comp time" than she had been earning previously. The decision to place plaintiff on the day shift was made by Major John Perrone ("Perrone"). As Major of Operations, Perrone had the responsibility to coordinate assignments and to manage staffing of the personnel assigned to the road patrol. In that capacity, Perrone made light duty assignments, based upon the assignments that were available and the departmental need to have those assignments filled. Perrone Dep., pp. 7–10. Many light duty assignments were "in support function areas and by their nature are necessarily filled during the second platoon (day hours)." Perrone Aff., ¶ 8. Perrone avers that he assigned plaintiff to the daytime shift in downtown Rochester "on the basis of departmental need and ... not based on [plaintiff's] gender or because she filed a complaint about the manner in which Captain Wright monitored her sick leave." *Id.* ¶ 11. Plaintiff contends that she requested to be assigned to the First Platoon, but Major Perrone met with her and told her that he wanted her to work during the day:

> [H]e [Perrone] called me in his office the next day and he said: What, don't you like to work down here with us? We like seeing you around. Are you antisocial? Why do you want to be on midnights? I think we'll keep you right here. All that.
>
> \* \* \* \* \* \*

Right in all of that, he said, Oh, we like seeing your pretty face around here every day, I think we'll keep you right down here with us.

DeMars Dep., p. 105. Thereafter, plaintiff contends that Perrone and another supervisor, Chief Nordquist, would watch her closely, and stare at her. Plaintiff believes that Perrone and Nordquist did this in order to "intimidate" her. *Id.* at 86.

Plaintiff further alleges that her supervisor in the Training Unit, Sergeant Mike Radler ("Radler"), took daily notes on her job performance. Radler informed plaintiff that he was taking these notes, and he permitted plaintiff to read them. DeMars Dep., p. 90–91. On May 24, 2000, Radler had plaintiff complete a one-and-a-half page memorandum, summarizing her injury and the treatment she had received and was receiving. In the Training Unit, plaintiff was assigned to work near a telephone bearing the general telephone number for the Training Unit, and to answer the incoming calls. Over a period of approximately five months, plaintiff answered six or seven telephone calls from Wright, who had called the Training Unit to speak with Radler. On these occasions, Wright never made conversation with plaintiff, but merely asked to speak with Radler. Wright also came to the training unit on a couple of occasions to meet with Radler.

In July 2000, plaintiff requested, and was granted, a one-year unpaid leave from the Sheriff's Office. In January 2001, plaintiff returned to work. At plaintiff's request, Chief Nordquist assigned her to the Community Services Unit to work as a D.A.R.E. officer. DeMars Dep., p. 103. Plaintiff worked in that capacity until she retired due to unspecified health reasons.

It is undisputed that during the period in question, Wright made multiple telephone calls to and visited male deputies who were out on sick leave. Wright Dep., pp. 100–101. For example, with regard to one male deputy who was out of work for four to six weeks, Wright visited him twice and called him on the telephone three to four times. *Id.*, p. 101. With regard to another male deputy, Wright made "a number of phone calls to his residence" and took him out to lunch. *Id.* Also during the period at issue here, male deputies, who, like plaintiff, normally received increased pay for working First Platoon in C Zone, were placed on light duty during the day, either at C Zone or in downtown Rochester.[5] Male deputies were also required to provide written reports concerning their medical condition. Perrone Dep., p. 11.

Plaintiff commenced this action on September 24, 2001, alleging that the Sheriff's Office violated Title VII by treating her differently than male officers, by creating a sexually hostile working environment, and by retaliating against her for filing an Internal Affairs complaint against Wright. In support of these claims, plaintiff relies on the facts as set forth above, which she contends demonstrate that: 1) Because she was a female, Wright "immediately disbelieved her injury and began raising concerns" about her sick leave (DeMars Memo, p. 4); 2) Wright called and visited her more frequently than male deputies, in order to "intimidate" her into returning to work (DeMars Dep., p. 37); 3) someone wrote the words "no balls" on her package to mean that she is "a girl and not tough" (DeMars Dep., p. 54); 4) that she was put on the day shift, instead of First Platoon,

---

**5.** Deputies Tom Burns and Steve Ciminelli were placed on light duty during the day in downtown Rochester, while Deputy Mike Burnside was placed on light duty during the day in C Zone.

in retaliation for filing an Internal Affairs complaint against Wright; 5) Perrone, Nordquist, and Radler harassed her by closely monitoring, by taking notes on her performance, and by requiring her to complete a written statement regarding her injury; 6) Perrone prevented her from obtaining overtime with the Explorers and the D.A.R.E. program while she was on light duty, but allowed male officers on light duty to do so; and 7) Wright harassed her by calling the Training Unit's main telephone number, instead of dialing Radler's extension directly (DeMars Dep., p. 96). As proof of discriminatory animus, plaintiff cites to Wright's question, asking plaintiff whether she stayed in bed during the day or watched soap operas, the incident in which the words "no balls" were written on her package, and Perrone's statement that he liked to see her pretty face on the day shift. In moving for summary judgment, defendant contends that plaintiff has failed to demonstrate a prima facie case of disparate treatment, hostile work environment, or retaliation, and that, even if she had made a prima facie case, she has failed to produce evidence that defendant's reasons were false or that defendant was motivated by a discriminatory intent.

Counsel for the parties appeared before the undersigned for oral argument on September 10, 1999. The Court has thoroughly considered the parties' submissions and the arguments of counsel.

## ANALYSIS

### Rule 56

The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. See, Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). "[T]he movant must make a prima facie showing that the standard for obtaining summary judgment has been satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." Gummo v. Village of Depew, 75 F.3d 98, 107 (2d Cir.1996)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)), cert denied, 517 U.S. 1190, 116 S.Ct. 1678, 134 L.Ed.2d 780 (1996). Once that burden has been established, the burden then shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To carry this burden, the non-moving party must present evidence sufficient to support a jury verdict in its favor. Anderson, 477 U.S. at 249, 106 S.Ct. 2505. The parties may only carry their respective burdens by producing evidentiary proof in admissible form. FED. R. CIV. P. 56(e). The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. U.S. v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is

sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy,* 988 F.2d 303, 308 (2d Cir.1993).

In the instant case, plaintiff has submitted an affidavit in opposition to the summary judgment motion. However, it is well settled that the party opposing summary judgment may not create a triable issue of fact "merely by submitting an affidavit that disputes his own prior sworn testimony." *Rule v. Brine, Inc.,* 85 F.3d 1002, 1011 (2d Cir.1996) (citations omitted). Rather, such affidavits are to be disregarded. *Mack v. United States,* 814 F.2d 120, 124 (2d Cir.1987) (citations omitted). Applying this principle, the Court finds at the outset that two sections of plaintiff's affidavit in opposition to the summary judgment motion should be disregarded. First, In her affidavit, plaintiff alleges that following her surgery on October 5, 1999, Wright "began calling [her] home phone number *three to four times a week, sometimes two or three times a day,*" and later states that Wright called her *"almost daily."* DeMars Aff., ¶¶ 50, 58 (emphasis added). However, this statement is contradicted by plaintiff's sworn deposition testimony, wherein she stated that she documented Wright's telephone calls to her home. Specifically, she testified: "Q. And did you *document all those phone calls in note form* as they came in? A. *Pretty much.*" DeMars Dep., p. 43 (emphasis added). Plaintiff further testified:

Q. Was there any times when you received voice mail messages and it was Captain Wright who had called?

A. Yes.

Q. Do you know how many times that would have happened, or how often that would have happened?

A. *No. I would have to look.*

Q. What would you be able to look at?

A. *Notes.*

DeMars Dep., p. 56 (emphasis added). However, plaintiff's notes, which she testified were accurate, and which she submitted to the Sheriff's department of Internal Affairs in support of her complaint against Wright, indicate that Wright called her only five times in October 1999 (including two calls on one day), only four times in November 1999 (includes two calls on one day), and only four times in December 1999. Clearly, plaintiff's sworn deposition testimony contradicts her statements now that Wright called her "three to four times a week, sometimes two or three times a day," and "almost daily." The Court further finds that plaintiff's affidavit is contradicted concerning a statement allegedly made by Wright. In her affidavit, plaintiff alleges: "Captain Wright continued to call on a regular basis. *He stated to me on one such occasion that I would have already gotten my act together if I were a man."* DeMars Aff. ¶ 62 (emphasis added). However, although she was questioned at length during her deposition regarding Wright's comments to her, she mentioned no such statement. Instead, during her deposition, plaintiff gave the following testimony:

Q. . . . I understand your contention is that Captain Wright contacted you excessively in an attempt to get you to come back to work. Is there any claim that Captain Wright made any inappropriate sexual comments to you during any of those phone calls?

\*　　\*　　\*　　\*　　\*　　\*

A. No, he didn't come right out and say anything sexual.

Q. Okay. Did he say, during any of those phone calls, did he say anything that you interpreted to be sexual in nature?

A. I did feel violated, especially one time, he asked me what I did all day, if I

laid around in bed watching soap operas and reading. I felt that was personal, more than personal.

DeMars Dep., p. 44. Thus, in her sworn deposition testimony, plaintiff identified the comment regarding the soap operas as being the only comment which Wright made that she interpreted to be of a sexual nature.[6] During oral argument of the motion, plaintiff's counsel attempted to sidestep this issue by indicating that Wright had made this comment to plaintiff in person, not over the telephone. However, as noted above, plaintiff herself indicated that Wright made the comment during a telephone call. *See*, DeMars Aff. ¶ 62. Moreover, plaintiff also testified that Wright had not made any improper comments to her in person while at C Zone. DeMars Dep. P. 43. Plaintiff may not now claim that Wright said she would have "had her act together by now if she were a man" in order to create a triable issue of fact.[7] Accordingly, in ruling upon the subject motion, the Court will disregard these two portions of plaintiff's affidavit.

 Further, as mentioned earlier, the party opposing summary judgment must produce evidentiary proof in admissible form, demonstrating the existence of triable issues of material fact. Unsworn statements are not sufficient to defeat a motion for summary judgment. *Adickes v. S.H. Kress & Co.*, 398 U.S. at 158 n. 17, 90 S.Ct. 1598. The law in this regard is clear:

By definition, an affidavit is a sworn document, declared to be true under the penalties of perjury. Courts usually treat written statements subject to the penalty of perjury as the equivalent of an affidavit for summary judgment. To be considered in connection with a summary judgment motion, the rule requires that submissions in the form of statements be prepared as affidavits .... Failure to submit materials in this form will cause the submission to be disregarded by the court in its consideration of the pending motion.

11 MOORE'S FEDERAL PRACTICE, § 56.14[1][b] (Matthew Bender 3d ed.). A document's qualification as an affidavit is not determined by the presence or absence of "the stamp or seal of a notary." *Id.*; *see also, LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham*, 185 F.3d 61, 65 (2d Cir.1999)(discussing requirements of declarations pursuant to 28 U.S.C. § 1746); CHARLES ALAN WRIGHT ET AL., 10B FEDERAL PRACTICE & PROCEDURE § 2738 (1982)("Since 1976, affidavits no longer need to be notarized and will be admissible if they are made under penalties of perjury; only unsworn affidavits will be rejected."); *Flowers v. Abex Corp.*, 580 F.Supp. 1230, 1233 n. 2 (N.D.Ill.1984) ("Merely notarizing the signature does not transform a letter into an affidavit; nor do the letters conform to the requirements of 28 U.S.C. § 1746."). Here, plaintiff has submitted several docu-

---

**6.** The Court notes that in her notes, submitted along with her affidavit, which are hearsay but which the Court may consider as an admission, plaintiff described the conversation as follows: [B]efore I got off the phone he said "So what do you do all day? What do you do, lie around in bed? Do you watch soap operas? I said no sir, I read a lot goodbye." DeMars Aff. Exhibit A. Also, notably absent from plaintiff's detailed notes is any reference to a comment by Wright that plaintiff would have had her act together if she were a man.

**7.** The Amended Complaint contains an allegation that "Plaintiff's supervisor told her that she would have already gotten her act together if she were a man." Amended Complaint ¶ 21. However, the Amended Complaint is unsworn and signed only by plaintiff's counsel. Under oath, plaintiff was examined at length regarding what Wright allegedly said to her, and she testified that Wright said nothing of an overtly sexual nature.

ments which are not affidavits and which do not otherwise qualify as evidentiary proof in admissible form. Namely, plaintiff has submitted an unsworn letter from the President of the Monroe County Sheriff PBA, Inc., dated September 13, 2001, as well as photocopies of four letters from male employees of the Monroe County Sheriff's Office. Notably, these letters purportedly were written in July and August of 2001, in connection with plaintiff's complaint to the EEOC, and were not prepared in opposition to the summary judgment motion. *See,* Castner Affidavit, Exhibits A–E. The signatures on three of the letters are notarized while two are not, however, none of the statements are in the form of an affidavit, and none of the individuals indicate that they are swearing to the statements under penalties of perjury.[8] Accordingly, the Court will not consider any of the attachments to the Castner Affidavit in connection with the pending motion for summary judgment.[9] The Court will now consider the merits of plaintiff's claim.

*Title VII*

■ It is clear that "Title VII makes it unlawful for an employer to discriminate against any individual with respect to the 'compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Richardson v. New York State Department of Correctional Service,* 180 F.3d 426, 436 (2d Cir.1999) (citations omitted). "[T]o establish a claim of racial or gender discrimination under Title VII, a claimant must show that: 1) he belonged to a protected class; 2) he was qualified for the position; 3) he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Terry v. Ashcroft,* 336 F.3d 128, 138 (2d Cir.2003) (citation omitted).

■ To establish a prima facie case of retaliation under Title VII, "a plaintiff must demonstrate participation in protected activity known to the defendant, an employment action disadvantaging the person engaged in the protected activity, and a causal connection between the protected activity and the adverse employment action." *Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 566 (2d Cir.2000) (citations and inter-

---

**8.** Exhibit D is a letter which is not in affidavit form and which does not indicate that it was written under the penalty of perjury. The signature is notarized, and the Notary Public has included a barely legible statement which appears to indicate "Sworn ... 28th day of Aug. 2001." However, the Court finds that a notary public cannot convert an otherwise unacceptable letter into an affidavit merely by using the word "sworn" and affixing a notary's stamp.

**9.** The Court notes that, even if it were to consider the letters from the male Sheriff's office employees, it would not change the outcome of this decision, since plaintiff has not shown that she and the male officers were similarly situated. Thomas Burns indicates that twice while under Wright's supervision, he was out on extended leave, which is defined as an absence of three or more consecu-

tive days, *see,*Order 19–98, § VII. However, Burns does state how long he was out of work, therefore there is nothing to indicate that his absence was similar in duration to plaintiff's. Similarly, Thomas McShea does not indicate how long he was out of work, and he further states only that his supervisor contacted him by telephone an unspecified number of times, but did not visit him. Patrick Ponticello and Terry Jamison each stated that they had been out of work only one month, during which time Wright had called each of them. As discussed earlier, plaintiff had already been out of work four months when Wright assumed command of Zone C, and even then, Wright only called plaintiff a "few" times during the next several months. Further, none of the male officers were taking college classes or engaging in similar activities while out on extended sick leave.

nal quotations omitted). Making a complaint regarding harassment to one's supervisor is "protected activity" under Title VII. *Id.*

 Title VII discrimination and retaliation claims are analyzed under the three-tier burden-shifting test "set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and its progeny." *Valentine v. Standard & Poor's,* 50 F.Supp.2d 262, 281–82 (S.D.N.Y.1999) (Citations and internal quotations omitted), *aff'd,* 205 F.3d 1327 (2d Cir.2000). Under the first tier of the *McDonnell Douglas* test, the plaintiff must establish a prima facie case. If the plaintiff establishes her prima facie case,

> the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employee's discharge. At this stage, the employer need only articulate—but need not prove—the existence of a nondiscriminatory reason for its decision. If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity. Once defendant meets its burden of production, the burden shifts back to plaintiff. Under the third tier of the *McDonnell Douglas* test, plaintiff bears the ultimate burden of proving that the reason proffered by the employer is a pretext for unlawful discrimination. In order to survive a motion for summary judgment, plaintiff must establish a genuine issue of material fact as to whether the employer's reason for discharging her is false and as to whether it is more likely that a discriminatory reason motivated the employer to make the adverse employment decision.

*Valentine,* 50 F.Supp.2d at 281–82 (Citations and internal quotations omitted).

 Hostile work environment claims are somewhat different. To survive a motion for summary judgment involving a hostile work environment claim, a plaintiff

> must elicit evidence from which a reasonable trier of fact could conclude (1) that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of his or her work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer.

*Mack v. Otis Elevator Co.,* 326 F.3d 116, 122 (2d Cir.2003) (citation and internal quotation marks omitted). With regard to the first of these elements, it is clear that

> [i]solated instances of harassment ordinarily do not rise to th[e] level [of a hostile work environment]. Rather, the plaintiff must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment. Determining whether workplace harassment was severe or pervasive enough to be actionable depends on the totality of the circumstances.

*Cruz v. Coach Stores, Inc.,* 202 F.3d at 570 (citations and internal quotations omitted). Factors which the Court should consider include "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether the conduct was physically threatening or humiliating, or a 'mere offensive utterance;' (4) whether the conduct unreasonably interfered with plaintiff's work; and (5) what psychological harm, if any, resulted." *Richardson,* 180 F.3d at 437.

 Courts must be "particularly cautious about granting summary judgment to an employer in a discrimination

case when the employer's intent is in question. Because direct evidence of an employer's discriminatory intent will rarely be found, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) (citations and internal quotations omitted). However, a plaintiff may not defeat a motion for summary judgment merely by relying upon "purely conclusory allegations of discrimination, absent any concrete particulars." *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985), *cert. den.* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74.

▆▆▆▆ It is clear that "the burden of proof that must be met to permit an employment-discrimination plaintiff to survive a summary judgment motion at the prima facie stage is *de minimis.*" *Chambers v. TRM Copy Centers Corp.,* 43 F.3d 29, 37 (2d Cir.1994) (emphasis in original, citation and internal quotation marks omitted). Nonetheless, the Court finds that in the instant case, plaintiff has failed to demonstrate a prima facie case as to any of her three claims. With regard to her disparate treatment and retaliation claims, the Court finds that plaintiff has not shown that she suffered an adverse employment action.[10] To make a prima facie showing of an adverse employment action, the plaintiff must show that the employer's actions caused a materially adverse change in the terms and conditions of employment, such as termination or demotion with an accompanying decrease in wage or salary. *Valentine v. Standard & Poor's,* 50 F.Supp.2d at 283. Things such as "[n]egative evaluations alone, without any accompanying adverse result, ... are not cognizable." *Id.* It is well settled that

> [a] plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment. To be materially adverse a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation.

*Galabya v. New York City Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir.2000) (Citations and internal quotations omitted). There is no "bright-line rule" for identifying an adverse employment action, rather, "courts must pore over each case to determine whether the challenged employment action reaches the level of 'adverse'". *Richardson,* 180 F.3d at 446. Applying these principles, the Court finds that neither Wright's monitoring of plaintiff, nor Perrone's placement of plaintiff on the day shift versus the night shift, constituted an

---

**10.** Plaintiff identified the adverse employment action she allegedly suffered, in part, as follows: "Deputy DeMars clearly suffered an adverse job action in that other deputies who were out on sick leave were able to concentrate on following their doctor's orders and get better." Pl. Memo, p. 8. Plaintiff further states that her assignment on light duty in downtown Rochester, as opposed to C Zone, was adverse because it was "further from her home, she had to walk farther from her car to get into the building, she lost her pay differen-

tial [never quantified], she was required to pay for parking when she did not have to before, she lost her midnight hours which were much more convenient for her, and she was constantly afraid that she would run into Captain Wright as he was often in that office." *Id.* With regard to this last factor, i.e. her alleged fear of running into Captain Wright, plaintiff testified that she saw Wright downtown "a couple" of times in six months. DeMars Dep., p. 97.

adverse employment action. At most, plaintiff's assignment on the day shift was a temporary change in duties that she found inconvenient. Nor was it an adverse employment action when Wright asked Internal Affairs to monitor plaintiff. There is no indication that Wright filed a formal complaint against plaintiff, and the investigation did not result in any action being taken against plaintiff. Nor has plaintiff otherwise shown that she suffered an adverse employment action.

■ Further, plaintiff has not shown that any employment action took place under circumstances giving rise to an inference of discrimination. Plaintiff maintains that she was treated differently than males with regard to the number of times that she was contacted while out on extended sick leave, but she has come forward with no evidentiary proof in admissible form to support that claim. Similarly, plaintiff claims that all male deputies who usually worked First Platoon at C Zone were allowed to return to light duty work on First Platoon, but she has presented no evidentiary proof in admissible form to support that claim either. Finally, plaintiff alleges that when she returned to work on light duty in January 2000, she "was advised" that she could not work and obtain overtime with the "Explorers" or as a D.A.R.E. officer, while men on light duty were allowed to do so. DeMars Aff., ¶ 89. Again, however, she has offered no evidentiary proof to support this conclusory assertion. Accordingly, the Court finds that plaintiff has not made a prima facie showing of disparate treatment or retaliation. Moreover, even if she had, she has not shown that defendant's reasons were false, or that defendant was actually motivated by discriminatory animus. Defendant has shown, by evidentiary proof in admissible form, that male and female officers were treated the same with respect to sick leave monitoring and light duty assignments.

Moreover, defendant has shown that Wright had the absolute right, and in fact the duty, to closely monitor plaintiff while she was out on sick leave for ten months. Additionally, defendant has explained that it was plaintiff's claimed inability to work a few hours per day on light duty, while she simultaneously took college classes and full-day training classes, that caused Wright to closely monitor plaintiff.

■ Plaintiff has also failed to make a prima facie showing of a hostile work environment. To the extent that plaintiff is claiming that Wright's telephone calls and his one visit to here home, created a hostile work environment, the Court disagrees, since Wright's conduct was not sexual in nature or otherwise inappropriate. Nor does the fact that Perrone, Nordquist, and Radler closely monitored plaintiff's work establish a hostile work environment. Further, assuming that the "no balls" incident was intended as a sexist remark, there is absolutely no proof that this incident was anything other than a bizarre, isolated act by an unknown individual. Similarly, Wright's question to plaintiff about whether or not she watched soap operas, and Perrone's passing reference to plaintiff's "pretty face," do not, separately or together, rise to the level of a hostile work environment. *See, Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 768 (2d Cir.1998).

## CONCLUSION

For all of the foregoing reasons, defendants' motion for summary judgment [# 25] is granted, and this action is dismissed.

SO ORDERED.