**James L. HARRIS, Plaintiff,**

v.

**FRANZISKA RACKER CENTERS, INC. Defendant,**

No. 5:02–CV–0189.

United States District Court, N.D. New York.

Oct. 1, 2004.

Thomas H. Kheel, Esq., Ithaca, NY, for Plaintiff.

Harris Beach LLP (Mark B. Wheeler, Esq., Of Counsel), Ithaca, NY, for Defendant.

## AMENDED MEMORANDUM DECISION AND ORDER

MUNSON, Senior District Judge.

### BACKGROUND

James Harris ("plaintiff") was employed by Franziska Racker Centers ("FRC") from October 25, 2000, and was dismissed from employment there on December 18, 2000. On or about June 29, 2001, plaintiff filed discrimination charges with the Equal Employment Opportunity Commission ("EEOC"). The charges alleged discrimination on the basis of race, sexual harassment, and retaliation for making complaints. No claim of disability discrimination under the Americans with Disabilities Act was asserted. The EEOC investigated plaintiff's charges and determined that there were no statutory violations by FRC.

Plaintiff received a Right to Sue letter from the EEOC, and filed this lawsuit on February 12, 2002, claiming violations of 42 U.S.C. § 2000e—racial and sexual discrimination, 42 U.S.C. 12—disability discrimination, and New York State Executive Law § 290, et seq. The complaint asserts that (1) he was subjected to a hostile work environment based on race from his co-employee, Claud Brown, who often told "nigger jokes" which he, an African–American, found offensive; (2) a supervisor, Jessica Simons, made sexual advances, demanded sexual favors as a condition of his employment, and sent him pornographic e-mails and letters and telephoned him in the middle of the night; and (3) that he was discriminated against because of disabling injuries sustained at work.

Currently before the court are defendant's two motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, one to dismiss the complaint, the other for judgment on defendant's counterclaim. Plaintiff has entered opposition to each motion.

### DISCUSSION

Rule 56 of the Federal Rules of Civil Procedure permits summary judgment where the evidence demonstrates that "there is no genuine issue of any material fact and the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986). Summary judgment is properly regarded as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 326, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1991)(quoting Federal Rule of Civil Procedure 1). In determining whether there is a genuine issue of material fact a court must resolve all ambiguities and draw inferences against the moving party. *United States v. Diebold*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)(*per curiam*). An issue of credibility is insufficient to preclude the granting of summary judgment. Neither side can rely on conclusory allegations or statements in affidavits. The disputed issue of fact must be

supported by evidence that would allow a "rational trier of fact to find for the non-moving party." *Matsushita Electric Industrial v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Unsupported allegations will not suffice to create a triable issue of fact. *Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir.1995). Nor will factual disputes that are irrelevant to the disposition of the suit under governing law preclude the entry of summary judgment. *Anderson*, 477 U.S. at 247, 106 S.Ct. at 2509.

 Summary judgment is appropriate in discrimination cases for "the salutary purposes of summary judgment— avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to commercial or other areas of litigation." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.1985). The "impression that summary judgment is unavailable in discrimination cases is unsupportable." *McLee v. Chrysler Corp.*, 38 F.3d 67, 68 (2d Cir.1994). The Supreme Court has also reiterated that the trial courts should not "treat discrimination differently from other ultimate questions of fact." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147, 120 S.Ct. 2097, 2109, 147 L.Ed.2d 105 (2000)(quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 524, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)). Determination of employment discrimination claims made pursuant to administrative proceedings or contractual grievance processes are not given any preclusive effect under doctrines like *res judicata* in future suits to redress grievances under Title VII. *Hewitt v. Alcan Aluminum Corporation*, 185 F.Supp.2d 183, 187 (N.D.N.Y.2001). The remedies in an administrative action or under a grievance procedure are different than those available under Title VII, and, in any event, the federal courts are intended as the final arbiter of rights under Title VII, not administrative agencies or tribunals. *Bembry v. Darrow*, 97 F.Supp.2d 281, 285 (N.D.N.Y.2000).

*Title VII—Race Discrimination Claim:*

FRC is a non-profit corporation licensed by the New York State Health Department to provide services to people with developmental disabilities and other handicapping conditions. FRC operates several community residences for persons with disabilities.

Plaintiff, a male Afro–American, was employed as a residence counselor at the Evergreen residence in Dryden, NY. He usually worked the 11:00 pm—9:00 am night shift and was responsible for the day-to-day care of the occupants.

Plaintiff maintains that he was subjected to racial discrimination in a hostile work environment based upon two comments and one joke made by fellow employee, Claud Brown. Plaintiff recalls that between November 10 and 13, 2000, Brown said something about the "Ku Klux Klan" (Def. Ex. 4—plft's Dep. p. 58, 61). On two other unspecified dates, Brown made "some joke about a bus load of niggers going over a cliff." (Def.'s Ex. 4—plft's Dep. p. 61), and that a female co-worker liked "dark meat." (Counter Statement ¶ 57). Plaintiff did not identify any other specific remark or joke made by Brown or any other FRC employee. (Def. Ex. 4— ptlf.'s Dep. p. 67). Plaintiff's recollection of Brown's comments is vague; he could not recall the whole emphasis of the Ku Klux Klan comment, and states "it was some reference about watching out for the Ku Klux Klan and then he [Brown] laughed" (Def. Ex. 4 ptlf.'s Dep. p. 58). Plaintiff never told Brown that he found his jokes offensive, he merely ignored him, and, in fact, found Brown's poor work per-

formance more bothersome than his racial jokes. (Def. Ex 4—ptlf.'s Dep. p. 68, 73).

On November 28, 2000, plaintiff met with Patricia Montanez, one of his supervisors, and complained about Brown's poor work performance and his racial comments. She suggested that plaintiff make Brown aware that these comments make him feel uncomfortable, and to discuss the matter further with Residence Coordinator at Evergreen, Frank Leahy. (Montanez affd. p. 3). Plaintiff was happy with her response to his concerns. (Def. Ex. e— ptlf.'s Dep. p. 84).

During November 2000, plaintiff also talked with Audrey Griswold, the Assistant Residence Coordinator at the Evergreen Residence. She reported to Frank Leahy, who had overall responsibility for Evergreen. (Griswold affd. ¶ 1). Plaintiff made her aware of Brown's racial comments (*Id.* at ¶ 13). He did not complain of being harassed, intimidated or threatened by Brown. (*Id.* at ¶¶ 18, 19). Griswold told plaintiff to advise Brown that he was offended and he agreed to do so. (*Id.* at ¶ 14). Plaintiff felt that Griswold was very receptive to his problems.(Def. Ex. e pltf.'s Dep. pp. 71, 74).

After her meeting with Plaintiff, Griswold met with Brown and told him that his racial remarks to plaintiff were inappropriate and instructed him not to make any more such remarks to plaintiff and to apologize to him. Brown indicated that he understood, and would follow her instructions (Griswold affd. ¶ 16). After this meeting with Brown, she heard nothing further about the matter. She saw plaintiff regularly and discussed other matters with him, but he never again complained about racial comments or make any other accusations against Brown. (*Id.*¶¶ 16, 17). She assumed that the matter was resolved and saw no reason to bring it to Frank Leahy's attention. (*Id.*¶ 18).

To establish a hostile work environment claim, plaintiff must allege that Claud Brown's conduct was sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment. *Harris v. Forklift Systems,* 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993) (quoting *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986)). The conduct must be intimidating, hostile, or offensive, with discriminatory intimidation, ridicule, and insult permeating the workplace. *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 (2d Cir.1995). Considering all of the circumstances, a reasonable person would have to find the environment hostile or abusive, and the victim must have subjectively so perceived it. *Harris v. Forklift Systems,* 510 U.S. 17, 21–23, 114 S.Ct. 367, 370–71, 126 L.Ed.2d 295 (1993), *Whidbee v. Garzarelli Food Specialties, Inc.,* 223 F.3d 62, 69–71 (2d Cir.2000). "Conduct that is 'merely offensive' and 'not severe or pervasive enough to create an objectively hostile or abusive work environment' " is insufficient to establish a Title VII discrimination claim. *Torres v. Pisano,* 116 F.3d 625, 631 (2d Cir.), cert. denied, 522 U.S. 997, 118 S.Ct. 563, 139 L.Ed.2d 404 (1997).

■ Comments and behavior, although boorish and inappropriate, simply do not rise to the level of behavior necessary for a jury reasonably to conclude that they were sufficiently severe or pervasive to alter the condition of plaintiff's employment. Isolated incidents of discriminatory comments or conduct is not sufficient to establish a hostile work environment. *Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662 (1998) (" 'simple teasing,' ... offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of

employment.' "); *Harris v. Forklift Systems, Inc.,* 510 U.S. at 21, 114 S.Ct. at 370 (" 'mere utterance of an ... epithet which engenders offensive feelings in an employee,' ... does not sufficiently affect the conditions of employment to implicate Title VII"); *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 768 (2d Cir.1998) ("As a general matter, 'isolated remarks or occasional episodes of harassment will not merit relief under Title VII; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive.' "); *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) ("For racist comments, slurs, and jokes to constitute a hostile work environment, there must be 'more than a few isolated incidents of racial enmity,' ... meaning that '[i]nstead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments....' "); *Snell v. Suffolk County,* 782 F.2d 1094, 1103 (2d Cir.1986) ("To establish a hostile atmosphere ... plaintiffs must prove more than a few isolated incidents of racial enmity.").

■ Plaintiff's allegations do not establish hostile work environment harassment. Although plaintiff may have found some of Claud Brown's alleged comments objectionable, those comments were sufficiently isolated and discrete that a trier of fact could not reasonably conclude that they pervaded plaintiff. The workplace plaintiff describes cannot, as a matter of law, be said to be permeated with discriminatory intimidation, ridicule, and insult that is sufficiently pervasive to alter the conditions of his employment and create an abusive working environment. *Patterson v. CBS, Inc.,* 2000 WL 666337 at *8 (S.D.N.Y. May 22, 2000).

■ Additionally, after learning of Claud Brown's conduct, plaintiff's employer, through Audrey Griswold, quickly took steps to ensure that it would not be repeated. Plaintiff's problem was addressed immediately, it was neither disregarded or left to languish. The employer used reasonable care to promptly address and further prevent the inappropriate conduct complained of by plaintiff, and incurred no hostile work place liability as a result. *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 764, 118 S.Ct. 2257, 2270, 141 L.Ed.2d 633 (1998).

*Title VII—Sexual Harassment Claim:*

In his unverified complaint, plaintiff contends that a fellow employee, Jessica Simon, whom he thought was his supervisor, subjected him to a hostile work environment through sexual harassment. Simon's job title was, supervising residence counselor, she was listed under Supervisory Staff on the Evergreen telephone list, was a part of his orientation team and signed the certification that he had completed the orientation program, and had some oversight on a modest portion of his work. Plaintiff's declaration that he thought Simon would fire him if he refused her sexual advances is directly contradicted in pages 180, 181 of his Deposition testimony where he states that, to his knowledge, Jessica Simon did not have the authority to fire or hire people for FRC. Plaintiff alleges that he informed Frank Leahy, Residence Coordinator at Evergreen, about the sexual harassment, but was told that if he said anything more about it, he would be fired. (Complaint ¶ 13).

42 U.S.C. S 2000e et seq. ("Title VII"), provides, in relevant part, that:

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, be-

cause of such individual's race, color, religion, sex, or national origin... 42 U.S.C. § 2000e–2(a).

■ While any form of sexual harassment may be considered undesirable, Title VII's scope is limited to "pervasive" or "severe" harassment that alters the conditions of employment and creates an abusive work environment. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). A plaintiff must either demonstrate a single extraordinarily severe incident, or a series of incidents that were sufficiently "continuous and concerted to have altered the conditions of her (his) working environment." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir.2000).

In order to prevail on a claim that sexual harassment caused a hostile work environment in violation of Title VII, a plaintiff must establish two elements:

First, the plaintiff must show that the workplace is permeated with "discriminatory intimidation, ridicule, and insult...that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment."

Second, the plaintiff must show that "a specific basis exists for imputing the conduct that created the hostile environment to the employer." *Howley v. Town of Stratford*, 217 F.3d 141, 153–54 (2d Cir. 2000).

■ An employer is presumed absolutely liable if the victim's supervisor perpetrated the harassment, though the employer may interpose an affirmative defense to rebut that presumption. *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). When the alleged harasser is a co-worker, however, the plaintiff must demonstrate that the employer " 'failed to provide a reasonable avenue for complaint or if it knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action.' " *Howley*, 217 F.3d at 154.

Defendant disputes that Jessica Simon was plaintiff's supervisor. The affidavits of Frank Leahy and Audrey Griswold, Resident Coordinator and Assistant Resident at Evergreen respectively, state that Jessica Simon was a co-worker with plaintiff, she performed the same direct care work as that performed by plaintiff and the other residence counselors, was an hourly employee, making $9.50 per hour in 2000, she had no authority to discipline employees or to hire, fire or promote employees at FRC, and that her direct supervisor was Audrey Griswold, the same person who supervised plaintiff. (Leahy affd. at ¶¶ 19, 29); (Griswold affd. ¶¶ 21, 22).

■ There is a difference between a "supervisor" in the colloquial sense and a "supervisor" under the rubric of Title VII. The assignment of vicarious liability to the employer for the action's of a supervisor is predicated on the assumption that an alleged supervisor has authority to undertake or recommend tangible employment decisions affecting the employee, or has authority to direct the employee's daily work activities. *Mack v. Otis Elevator*, 326 F.3d 116, 117 (2d Cir.2003). While Jessica Simon's job title, Evergreen telephone listing, orientation training certifier and some oversight responsibility, may indicated a modicum of supervisory authority, her position was not endowed with the typical (and for Title VII purposes, relevant) trappings of authority set forth in *Mack*, and there is no evidence in the record to support plaintiff's assertion that Jessica Simon was his supervisor at the Evergreen Residence. To the contrary, the undisputed evidence shows that it was

Audrey Griswold, not Simon who supervised plaintiff.

■ Because Jessica Simon was not plaintiff's supervisor for Title VII purposes, plaintiff can only hold FRC liable for her alleged actions if FRC was negligent because it either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it. *Richardson v. New York State Department of Correctional Service*, 180 F.3d at 426, 441 (2d Cir.1999).

In the complaint plaintiff alleges that when he protested to Frank Leahy about Jessica Simon's sexual advances, Leahy told him that he new what was going on and, if plaintiff continued to complain about it, he would be fired. (Complaint ¶ 14).

In his affidavit, Frank Leahy, explains, that shortly after plaintiff began working at Evergreen, he was advised by another staff member that Jessica Simon had visited Evergreen late at night when she was not scheduled to work, and, that during the visit, she and plaintiff spent considerable time on computer activities unrelated to any employment duties. He then met with Simon and plaintiff individually and explained that such visits were unsuitable and were not to take place again.

Simon apologized saying that she was just helping him to "learn the ropes," and did not realize it would be a problem. Plaintiff reiterated Simon's statement, told Leahy that "nothing happened," and made no mention of any sexual activities between them during the visit. Leahy later met privately with plaintiff and gave him a chance to discuss Simon's night visits. Plaintiff made no mention of any improprieties that took place during her visit, and gave no indication that Simon had harassed him or undertook any unfitting behavior.

During the term of his employment at Evergreen, Plaintiff never complained to him concerning Simon engaging in offensive sexually related conduct or verbal or written communications.

He did not threaten plaintiff with discharge if he reported Simon's visit. He confronted plaintiff about it because unauthorized night visits were unacceptable. At no time did plaintiff even hint that Simon harassed him sexually or otherwise. (Leahy affd. ¶ s 21–26).

"The gravamen of any sexual harassment claim is that the alleged sexual advances were unwelcome." *Meritor Savings Bank*, 477 U.S. 57, 68, 106 S.Ct. 2399, 2406, 91 L.Ed.2d 49 (1986). Recognizing that coercion may take forms subtler than direct physical attacks, the Supreme Court took care in *Meritor* to articulate that the plaintiff alleging harassment need not demonstrate that "her actual participation" was involuntary. It suffices that she show "by her conduct . . . that the alleges sexual advances were unwelcome." *Id.* "In determining whether conduct was unwelcome, the nature of the sexual advances and the context in which they occurred are to be viewed in light of the totality of the circumstances at issue." *Henson v. City of Dundee*, 682 F.2d 897, 903 (11th Cir.1982), *cert. denied*, 529 U.S. 1068, 120 S.Ct. 1674, 146 L.Ed.2d 483 (2000). "Where a plaintiff's action in the workplace shows that he was a willing participant in the conduct at issue, courts are less likely to find that the conduct was 'unwelcome' or 'hostile.' " *Balletti v. Sun–Sentinel Co.*, 909 F.Supp. 1539, 1547 (S.D.Fla.1995).

Plaintiff testified that Jessica Simon came to see him at work, talked about sex and touched him, (Def. Ex. 4 Pltf.'s Dep. p. 115). He was shocked, but laughed it off (*Id.* at p. 119). They "spoke a lot that night," but he said nothing to her in response to this sexual activity. (*Id.* at pp.

119–120). He never complained to her or gave her any indication at all that her conduct was unwelcome. (*Id.* at p. 121). Plaintiff did not find her conduct to be "offensive," instead he claimed merely that, "[he] didn't know what to think of it." (*Id.* at p. 125) During the same period, she invited him to meet here at Stewart Park. Plaintiff did meet her there, and they engaged in consensual sexual activity. (*Id.* at pp. 127, 128). Plaintiff admitted that he consented to her having oral sex in her car at Steward Park.

The e-mail plaintiff sent her shortly after she had visited him at work also demonstrates that he was not the victim of unwelcome advances, but willingly took part in their sexual relationship. Plaintiff's e-mail stated that he was "worried about her," and offered to help her by transporting "small stuff" in his truck. He also asked her if she would be transferring to "Hook," (Another residence operated by FRC), and asked her to help him to also get transferred to the Hook residence.

Audrey Griswold, was the Assistant Residence Coordinator at Evergreen during the period that plaintiff worked there, and was his immediate superior. Over plaintiff's employment period, she observed that plaintiff and Jessica Simon were extremely friendly to each other. It was apparent from the way they sat near each other, laughed when they spoke together and showed other friendly behaviors toward one another, that they were quite fond of each other. It was certainly evident from her observations of their interactions with each other that plaintiff liked Simon and that her feelings were mutual.

Plaintiff never complained or even suggested to her that Simon had engaged in any sexual harassing activity or other offensive conduct of any nature whatsoever. If plaintiff had made a report to her of deviant conduct by Simon or anyone else, it would have been processed in accordance with FRC' Policy on Sexual Harassment. (Griswold affd. ¶s 26, 27).

Plaintiff never advised his immediate supervisor, Audrey Griswold or Frank Leahy, the Residence Coordinator, about Simon's sexual activities. (Griswold ¶27, Leahy ¶25). Nor did he use FCR's sexual harassment procedure to have his alleged sexual harassment investigated and remedied. During oral argument on this motion, plaintiff's counsel claimed that plaintiff did not know about the sexual harassment investigation procedure because it was not in FCR's employees handbook. However, the record clearly shows that on October 25, 2000, plaintiff attended a required new employees orientation meeting where the plaintiff signed a form acknowledging that, among the material reviewed at the meeting was the FRC's employees handbook and Sexual Harassment Procedure. (Def.Ex. 8, 10, 11). FCR's Policy on Sexual Harassment is clearly set forth on p. 5 of the employee's handbook, it states;

> Franziska Racker Centers does not allow or condone sexual harassment of or by employees, volunteers, consultants, students, interns, service providers or contractors. *A procedure is established with guidelines to conduct an investigation and provide remedies in sexual harassment matters.* (emphasis added).

At page 89 of his Deposition testimony, plaintiff acknowledged that he had read the employee handbook. The employee handbook language clearly shows that a sexual harassment policy was in place, and plaintiff only had to bring the sexual harassment issue to his immediate supervisor's attention to put an investigation in motion, but he did not do so.

Plaintiff's deposition testimony and e-mail dispel any notion that he made it known to Jessica Simon that her sexual

advances were unwelcome. Although plaintiff subsequently began to dislike her, "Over time," this dislike developed not from her willingness to engage in sexual activity, but because "she was a poser, she wanted to be black but couldn't. She made too many slang (*sic*), too much stuff about dating niggers and stuff like that … she was trying to live in a black world". (Def., Ex., 4—pltf.'s Dep. at 125,-126).

Plaintiff's deposition statements, e-mail, the Leahy and Griswold affidavit information, and his failure to report the situation or use the complaint procedure provided by the employer, demonstrate that his claim of being sexually harassed by Jessica Simon is unavailing.

*Title VII—Disability Discrimination:*

Plaintiff further claims that he was discriminated against because he sustained crippling, work related injuries to his hand and shoulder and he was not permitted to seek medical treatment for them. The record shows that plaintiff was not severely injured, and he did receive treatment for both injuries.

■ Defendant first asserts that the court has no jurisdiction over this claim because plaintiff failed to state it in his EEOC charge. It is true that courts have no jurisdiction to hear claims not alleged in the employee's EEOC charge. The purpose of this exhaustion requirement is "to give the administrative agency the opportunity to investigate, mediate, and take remedial action." *Stewart v. United States Immigration & Naturalization Service*, 762 F.2d 193, 198 (2d Cir.1985). However, claims which are "reasonably related" to the EEOC charge may be brought in a subsequent federal court action. *Butts v. City of New York Department of Housing Preservation and Development*, 990 F.2d 1397, 1402 (2d Cir.1993). Such claims are permitted to continue where "the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Id.* The court finds that plaintiff's declaration in his EEOC complaint that he was "not allowed to go seek medical treatment when he was seriously injured," reasonably related to a disability discrimination claim and would expect that the EEOC, in investigating the complaint, would consider the merits of the claim.

■ Plaintiff sprained his right wrist while moving a television set on November 22, 2000. (Def. Ex. 4, ptlf.'s Dep. at 135). The medical records submitted by plaintiff show that he sprained the wrist and was treated and released. (Def.Ex. 15). He was given a restriction that he could not use his upper right arm at work for four days. (Def. 15—Medical Records).

On or about December 9, 2000, plaintiff claimed his right arm was injured when he was punched by a female resident. (Def. Ex 4—pltf's Dep. at 136). Medical records submitted by FRC indicate that he was again treated and released, and was subject to a twenty pound weight lifting restriction until the end of December 2000, a period of three weeks. (Def. Ex. 16 Medical Records). Plaintiff does not allege that he suffered a disability which substantially limited his major life activities.

■ A disability under the ADA "does not include temporary medical conditions, even if those conditions require extended leaves of absence from work" because such conditions are not substantially limiting. *Halperin v. Abacus Technology Corporation*, 128 F.3d 191, 199 (4th Cir.1997). "Courts within this circuit and the vast majority of courts elsewhere which have considered the question, have held that temporary disabilities do not trigger the protections of the ADA because individuals

with temporary disabilities are not disabled persons within the meaning of the act." *Graaf v. North Shore University Hospital,* 1 F.Supp.2d 318, 321 (S.D.N.Y. 1998); *Davis v. Bowes,* 1997 WL 655935 (S.D.N.Y. Oct.20, 1997). Furthermore, courts have held, as a matter of law, that a weight lifting limitation such as plaintiff's, when compared to an average person's abilities, "does not constitute a significant restriction on one's ability to lift, work or perform any other major life activity." *Williams v. Channel Master Satellite Systems, Inc.,* 101 F.3d 346, 349 (4th Cir. 1996), *cert. denied,* 520 U.S. 1240, 117 S.Ct. 1844, 137 L.Ed.2d 1048 (1997); *Strassberg v. Hilton Hotels Corp.,* 1997 WL 531314 (S.D.N.Y. August 28, 1997), aff'd. 173 F.3d 846 (2d Cir.1999).

Plaintiff's injuries were relatively minor and did not prohibit him from working as a residence counselor, albeit with some minimal restrictions for short periods. These injuries did not qualify as disabilities under the ADA.

*Title VII—Retaliatory Discharge Claim:*

Plaintiff maintains that he was fired from his job at Evergreen because of his race, his complaints of race discrimination and sexual harassment, and the disability he sustained from work-related injuries during his employment at the Evergreen Residence.

FRC states that the only reason plaintiff's employment was terminated was because of his communications with third parties about Evergreen residents in violation of FRC's Confidential Policy, and his highly indiscreet, sexual oriented and conjectural comments to other FRC employees regarding residents at Evergreen. (Walker affd. at ¶ ¶ 21, 22).

Prior to plaintiff's discharge, Gail Walker, Director of Human Services of FRC, had a meeting with Frank Leahy and Richard Rasmussen, Assistant Director of Residential Services for FRC, Frank Leahy, a Residence Coordinator for FRC, and Leahy's supervisor, where plaintiff's actions were reviewed. At the conclusion of the meeting, they concurred that plaintiff's employment should be terminated based on his violation of FRC's Confidential Policy, and his creation of an unsafe work environment by upsetting other Evergreen Residence staff with his inappropriate, unfounded and speculative claims of abuse. (Walker aff'd. at ¶ 23)..

Title VII prohibits an employer from discriminating against an employee who takes action in opposition to an unlawful employment practice. 42 U.S.C. § 2000e–3(a); *Kotcher v. Rosa & Sullivan Appliance Center, Inc.,* 957 F.2d 59, 64 (2d Cir.1992). Retaliation claims are tested under the three-step burden shifting analysis set forth in McDonnell Douglas. A plaintiff establishes a prima facie case for retaliation by showing that: (1) he/she was engaged in a protected activity of which her employer was aware; (2) he/she suffered some disadvantageous employment action; and (3) there was a causal connection between the protected activity and the adverse employment decision. *Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 714 (2d Cir.1996). The causal connection can be established directly through evidence of retaliatory animus directed at plaintiff by defendant, or indirectly by showing either that other employees engaged in similar conduct were given more favorable treatment, or that the adverse action closely followed the protected activity. *Johnson v. Palma,* 931 F.2d 203, 207 (2d Cir.1991); *Davis v. State University of New York,* 802 F.2d 638, 642 (2d Cir.1986). Once a prima facie case is established, the burden of production shifts to the defendant employer to "articulate a legitimate, nondiscriminatory reason for its actions." *Kotcher,* 957 F.2d at 64. If the defendant

meets its burden of production, then the plaintiff must show that defendants' proffered reasons were pretextual. *Kotcher,* 957 F.2d at 65.

At their orientation meeting, incoming employees of FRC are required to execute a Confidential Policy document containing the following statement:

Any information pertaining to individuals served by Franziska Racker Centers is strictly confidential. It is not to be discussed, except among appropriate Franziska Racker Centers Personnel, and professional personnel of other agencies directly involved with the individuals and their families, and only where written permission has been gained from the individual or their family. Franziska Racker Centers conforms with New York State confidentiality laws. Perusal of records without specific professional reason is not permitted. I have read the above statements and agree to abide by the Franziska Racker Centers' policy.

On October 25, 2000, plaintiff signed a copy of this statement acknowledging that he had read and received it on that date. (Def.'s Ex. 9). Additionally, he was given a copy of the FRC Employee Handbook. The Policy of Confidentiality is also set forth on Page 5 of this handbook, under the general heading of, Policy Statements. (Def.'s Ex. 10). Thus, the record does not support that plaintiff was ambushed by the enforcement of the confidentiality policy.

■ In early December 2000, plaintiff displayed a bothersome inclination to conjecture about intimate sexual activities, which he claimed some residents had taken part in. His telling other FRC staff members about these occurrences, gave rise to anxiety, and created an unsafe and disruptive work environment at the residence. He also made similar comments to persons not connected with FRC. The statements reached ("SG") the mother of ("LC"), a resident of Evergreen, and on December 18, 2000, she called Mr. Leahy to tell him that she was deeply disturbed by the comments plaintiff had made concerning her daughter. She was advised of the comments by another daughter of SG, with whom plaintiff had several conversations concerning LC. Plaintiff had insinuated that LC had been sexually abused and had wondered whether, based upon stretch marks he observed, LC had sexual relations. (Leahy affd. pages 8–10). Plaintiff's behavior here, was unauthorized and a straightforward violation of FRC's Confidential Policy. The decision to terminate plaintiff was based entirely on his misconduct, and not in any way connected with his discrimination claims.

■ Defendant FRC has articulated a legitimate and non-discriminatory reason for firing plaintiff, in that Walker, Rasmussen and Leahy genuinely believed that plaintiff had violated FRC's policy of confidentiality by the unauthorized disclosure of information regarding alleged events at the Evergreen Residence. In response, plaintiff has failed to demonstrate that the proffered reason is merely a pretext for racial bias. The record demonstrates that Walker, Rasmussen and Leahy were solely responsible for the decision to terminate plaintiff's employment and, furthermore, fails to support the inference that they harbored discriminatory animus against Harris or other minorities.

*State Law Claims:*

■ A district court may decline to exercise supplemental jurisdiction over a claim if it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. S 1367(c)(3). *Dean v. Westchester County District Attorney's, Office,* 119 F.Supp.2d 424, 433 (S.D.N.Y.2000). Consequently, as all federal claims have been

**238**

dismissed, the Court exercises its discretion and will dismiss the remaining state law claims, plaintiff's claims made pursuant to New York Executive Law § § 290 *et seq.*, and defendant's state law counter claim for libel. ("Compulsory counter claims may be dismissed where, as here, the initial claims giving rise to federal jurisdiction are dismissed." *Scott v. Long Island Savings Bank*, 937 F.2d 738, 743).

Accordingly, defendant's motion for summary judgment is **GRANTED**, and the complaint is **DISMISSED**, plaintiff's and defendant' remaining state law claims are **DISMISSED** without prejudice to their being brought in the appropriate New York state court for further proceedings.

**IT IS SO ORDERED**